*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JULEA WARD,
     *Plaintiff-Appellant/Cross-Appellee,*

          *v.*

VERNON POLITE; IRENE AMETRANO; PERRY
FRANCIS; GARY MARX; PAULA
STANIFER;YVONNE CALLAWAY; SUZANNE
DUGGER,
     *Defendants-Appellees/Cross-Appellants,*


ROY WILBANKS; FLOYD CLACK; GARY D.
HAWKS; PHILIP INCARNATI; MOHAMED
OKDIE; FRANCINE PARKER; THOMAS W.
SIDLIK; JAMES STAPLETON; SUSAN MARTIN,
                              *Defendants.*

Nos. 10-2100/2145

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-11237—George C. Steeh, District Judge.

Argued:  October 4, 2011

Decided and Filed:  January 27, 2012

Before:  GIBBONS and SUTTON, Circuit Judges; ADAMS, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  Jeremy D. Tedesco, ALLIANCE DEFENSE FUND, Scottsdale, Arizona,
for Plaintiff.  Mark T. Boonstra, MILLER CANFIELD, PADDOCK AND STONE,
P.L.C., Ann Arbor, Michigan, for Defendants.  **ON BRIEF:**  Jeremy D. Tedesco,
ALLIANCE DEFENSE FUND, Scottsdale, Arizona, David A. French, ALLIANCE
DEFENSE FUND, Columbia, Tennessee, Steven M. Jentzen, Ypsilanti, Michigan, for
Plaintiff.  Mark T. Boonstra, David R. Grand, MILLER CANFIELD, PADDOCK AND
STONE, P.L.C., Ann Arbor, Michigan, for Defendants.  Eugene Volokh, UCLA

_____

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio,
sitting by designation.

SCHOOL OF LAW, Los Angeles, California, Walter M. Weber, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., Deborah J. Dewart, Swansboro, North Carolina, Benjamin D. DuPré, FOUNDATION FOR MORAL LAW, Montgomery, Alabama, Eric C. Rassbach, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., Gregory M. Lipper, Ayesha N. Khan, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., David Sapir Lesser, Brian A. Sutherland, Alan E. Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, Jill M. Wheaton, Lauren M. London, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, Camilla B. Taylor, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Chicago, Illinois, Michael J. Steinberg, ACLU FUND OF MICHIGAN, Detroit, Michigan, Daniel Mach, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., Debra A. Kowich, UNIVERSITY OF MICHIGAN, Ann Arbor, Michigan, Bruce H. Edwards, MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Amici Curiae.

––––––––––––––––––

**OPINION**

––––––––––––––––––

SUTTON, Circuit Judge.  In its graduate-level counseling-degree program, Eastern Michigan University prohibits students from discriminating against others based on sexual orientation and teaches students to affirm a client's values during counseling sessions.  In three years with the program, Julea Ward frequently expressed a conviction that her faith (Christianity) prevented her from affirming a client's same-sex relationships as well as certain heterosexual conduct, such as extra-marital relationships.  That stance did not sit well with the values-affirming lessons of her counseling professors, but for nearly three years none of this prohibited Ward from continuing to take classes toward a degree and from doing well in the process.  Entering the last stages of the program with a 3.91 GPA, she signed up for a student practicum, a required course in experiential learning that requires students to put their training into practice by counseling real clients.  When the university asked Ward to counsel a gay client, Ward asked her faculty supervisor either to refer the client to another student or to permit her to begin counseling and make a referral if the counseling session turned to relationship issues.  The faculty supervisor referred the client.  The university commenced a disciplinary hearing into Ward's referral request and eventually expelled her from the

program.   Ward sued the university defendants under the First and Fourteenth Amendments.

Curriculum choices are a form of school speech, giving schools considerable flexibility in designing courses and policies and in enforcing them so long as they amount to reasonable means of furthering legitimate educational ends.  The key problem with the university's position is not the adoption of this anti-discrimination policy, the existence of the practicum class or even the values-affirming message the school wants students to understand and practice.  It is that the school does not have a no-referral policy for practicum students and adheres to an ethics code that permits values-based referrals in general.  When the facts are construed in Ward's favor, as they must be at this stage of the case, a reasonable jury could conclude that Ward's professors ejected her from the counseling program because of hostility toward her speech and faith, not due to a policy against referrals.  We reverse the trial court's grant of summary judgment in favor of the university.

I.

After teaching English and radio and television broadcasting at Southfield High School in suburban Detroit for ten years, Julea Ward decided to become a school counselor.  Ward enrolled at Eastern Michigan University in May 2006 and began taking classes towards a master's degree in counseling, all while continuing to teach full-time. In order to become a licensed counselor in Michigan, an individual must obtain a master's degree in counseling.  *See* Mich. Comp. Laws § 333.18107(1)(b).  Early on in the university's counseling program, Ward sparred with professors over faith-based issues, particularly her belief that Christianity prohibited her from "affirm[ing]" or "validat[ing]" the "homosexual behavior" of counseling clients.  R. 9-5 at 5.  When Ward expressed these views, professors disagreed, sometimes kindly, sometimes less so, but consistently making the point that, as a counselor, she must support her clients' sexual orientation, whatever that may be.

Despite these occasional conflicts, Ward did well academically.  She had a 3.91 grade point average going into the winter 2009 quarter, with just four classes (13 credit

hours) left to complete the degree. That quarter, she enrolled in a counseling practicum, a graduation prerequisite that requires students to apply what they have learned through one-on-one counseling sessions with real clients. Students spend a minimum of 40 hours counseling several clients over the course of the practicum. Students meet with clients in an office at the school, and they later meet with a faculty supervisor for at least one hour each week to discuss the clients, the practicum and their professional development.

Ward counseled her first two clients in practicum without incident. When she reviewed the file of the third client, she noticed he sought counseling about a same-sex relationship. Ward called her faculty supervisor, Professor Yvonne Callaway, and asked (1) whether she should meet with the client and refer him only if it became necessary—only if the counseling session required Ward to affirm the client's same-sex relationship—or (2) whether the school should reassign the client from the outset. Callaway reassigned the client.

When Ward met with Callaway the next day for their weekly meeting, Callaway was not happy. In twenty years of teaching, she told Ward, no practicum student had made such a request. Callaway told Ward that her actions created an "ethical dilemma," prompting her to schedule an informal review with Ward. R. 82-3 at 215. These meetings are not "disciplinary" but are designed "to assist the student in finding ways to improve his/her performance or to explore the option of the student voluntarily leaving the program." R. 14-7 at 15. Callaway, Ward and Ward's academic supervisor, Professor Suzanne Dugger, participated in the informal review. Callaway raised concerns about Ward's refusal to counsel the assigned client, and Ward reiterated her religious objection to affirming same-sex relationships. All three participants agreed that "the development of a remediation plan would not be possible." R. 80 at 2. Dugger and Callaway gave Ward two options: withdraw from the program or seek a formal review. Ward asked for a formal review, in which a committee composed of several faculty members and one student considers allegations of improper behavior or poor academic performance. The committee may impose a range of sanctions, from requiring a student to repeat a course to dismissing the student from the program.

Before the hearing, Dugger told Ward that she had violated two provisions of the American Counseling Association's (ACA) code of ethics by: (1) "imposing values that are inconsistent with counseling goals," Rule A.4.b, and (2) "engag[ing] in discrimination based on . . . sexual orientation," Rule C. 5. R. 1-4 at 2. The counseling program's student handbook incorporates the ACA code of ethics and tells students, including practicum students, to follow it.

The formal review committee consisted of two faculty members from the counseling program (Professors Irene Ametrano and Perry Francis), one faculty member from the education leadership program (Professor Gary Marx) and one student representative (Paula Stanifer). The hearing began with an explanation of the faculty members' concerns, including Callaway's and Dugger's accounts of Ward's practicum experience and their shared opinion that her conduct violated the code of ethics. Dugger recommended that Ward be dismissed from the counseling program.

Ward responded that she did not discriminate against anyone. She had no problem counseling gay and lesbian clients, so long as the university did not require her to affirm their sexual orientation. Because her professors taught her that counselors dealing with such clients "cannot talk about anything other than affirming [their same-sex] relationships," R. 1-5 at 18—a message Ward's religious beliefs prohibited her from delivering—Ward asked that she be allowed to refer gay and lesbian clients seeking relationship advice to another counselor.

Two days later, the university sent Ward a letter conveying the committee's unanimous opinion that she violated the code of ethics. Because Ward was "unwilling to change [her] behavior," the committee expelled her from the counseling program, effective that day. R. 1-7. Ward appealed the committee's decision to the Dean of the College of Education, Dr. Vernon Polite. He denied the appeal.

Ward filed this § 1983 action against the members of the formal review committee and Professor Callaway, Professor Dugger and Dean Polite as well as the President and the members of the Board of Regents of the University. Her expulsion from the program, she claimed, violated her free-speech and free-exercise rights under

the First and Fourteenth Amendments.  At the outset, the district court dismissed Ward's official-capacity claims against the President and Board of Regents because they did not play a role in the expulsion.

At the close of discovery, the district court granted the defendants' motion for summary judgment and denied Ward's cross-motion.  The court held that the university defendants permissibly enforced a neutral and generally applicable curricular requirement against Ward and did not target her because of her speech or religious beliefs.

## II.

The First Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, prohibits governments from "abridging the freedom of speech" and "prohibiting the free exercise" of "religion."  Ward claims the university defendants violated both guarantees.

## A.

The "freedom of speech" claim implicates two strands of law that occasionally run into each other.  At one level, governmental bodies, including public high schools and universities, have considerable authority to control their own speech.  *See Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271, 273 (1988); *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010).  Foremost among a school's speech is its selection and implementation of a curriculum—the lessons students need to understand and the best way to impart those lessons—and public schools have broad discretion in making these choices.  *See Christian Legal Soc'y v. Martinez*, 561 U.S. ___, 130 S. Ct. 2971, 2988–90 (2010).  This line of authority helps to explain why the First Amendment allows: (1) a public high school to delete stories from the school newspaper—one about teenage pregnancy, the other about the impact of divorce on students—given that the paper "bear[s] the imprimatur of the school" and the school's actions were "reasonably related to legitimate pedagogical concerns," *Hazelwood*, 484 U.S. at 271, 273; (2) a

public high school to require students who display a banner bearing the message "BONG HiTS 4 JESUS" during a school-sponsored event to remove the banner or face suspension because schools may "restrict student expression that they reasonably regard as promoting illegal drug use," *Morse v. Frederick*, 551 U.S. 393, 408 (2007); and (3) a law school at a public university to enforce an "all comers" policy requiring registered student organizations to accept all interested students regardless of whether their conduct or beliefs are consistent with the organizations' ideals, *Christian Legal Soc'y*, 130 S. Ct. at 2995 (2010).

The Court, at the same time, has insisted that the public schools are not expression-free enclaves. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). The free-speech clause generally prohibits suppressing speech "because of its message," and the Court has enforced that prohibition in the public school—indeed the university—setting. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The free-speech guarantee also generally prohibits the most aggressive form of viewpoint discrimination—compelling an individual "to utter what is not in [her] mind" and indeed what she might find deeply offensive—and the Court has enforced that prohibition, too, in the public school setting. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). This line of authority explains why the First Amendment prohibits public schools from: (1) expelling students who refuse to recite the Pledge of Allegiance, *id.* at 642; (2) suspending students for wearing black armbands to school to protest the Vietnam War, at least where there is no indication that the students' actions will "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," *Tinker*, 393 U.S. at 509; and (3) withholding funding for the publications of a student organization because the publication expresses a religious viewpoint, *Rosenberger*, 515 U.S. at 835.

In reconciling these principles, the Supreme Court tells us that "First Amendment rights" must be "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506. That is somewhat helpful. More helpful is this: Public educators may limit "student speech in school-sponsored expressive activities so

long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. The neutral enforcement of a legitimate school curriculum generally will satisfy this requirement; the selective enforcement of such a curriculum or the singling out of one student for discipline based on hostility to her speech will not. *See Christian Legal Soc'y*, 130 S. Ct. at 2987–88; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289–93 (10th Cir. 2004).

The *Hazelwood* test, it is true, arose in the context of speech by high school students, not speech by college or graduate students. But for the same reason this test works for students who have not yet entered high school, *Curry ex rel. Curry v. Hensiner*, 513 F.3d 570, 576–78 (6th Cir. 2008) (elementary school); *Settle v. Dickson Cnty. Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995) (junior high school), it works for students who have graduated from high school. The key word is student. *Hazelwood* respects the latitude educational institutions—at any level—must have to further legitimate curricular objectives. All educators must be able "to assure that participants learn whatever lessons the activity is designed to teach." *Hazelwood*, 484 U.S. at 271. Just as a junior high school English teacher may fail a student who opts to express her thoughts about a once-endangered species, say a platypus, in an essay about *A Tale of Two Cities*, *see Settle*, 53 F.3d at 155, so a law professor may fail a student who opts to express her views about Salvador Dali and the fourth dimension in a torts exam. That the First Amendment protects speech in the public square does not mean it gives students the right to express themselves however, whenever and about whatever they wish on school assignments or exams. "A school need not tolerate student speech that is inconsistent with its basic educational mission." *Hazelwood*, 484 U.S. at 266. Nothing in *Hazelwood* suggests a stop-go distinction between student speech at the high school and university levels, and we decline to create one. *Hosty v. Carter*, 412 F.3d 731, 734 (7th Cir. 2005) (en banc) (applying *Hazelwood* in university setting); *see also Keeton v. Anderson-Wiley*, No. 10-13925, ___ F.3d ___, 2011 WL 6275932, at *7–8 (11th Cir. December 16, 2011) (same); *Axson-Flynn*, 356 F.3d at 1289 (same); *Brown v. Li*, 308 F.3d 939, 949 (9th Cir. 2002) (same). To our knowledge, just one circuit has gone the other way—and that in a footnote, *Student Gov't Ass'n v. Bd. of Trustees of Univ. of*

*Mass.*, 868 F.2d 473, 480 n.6 (1st Cir. 1989), and even then based on what seems to be a misconception that *Hazelwood* decided the issue (it did not), *see Hazelwood*, 484 U.S. at 273 n.7.

By requiring restrictions on student speech to be "reasonably related to legitimate pedagogical concerns," *Hazelwood* allows teachers and administrators to account for the "level of maturity" of the student. 484 U.S. at 271. Although it may be reasonable for a principal to delete a story about teenage pregnancy from a high school newspaper, *id.* at 274–75, the same could not (likely) be said about a college newspaper. "To the extent that the justification for editorial control depends on the audience's maturity, the difference between high school and university students" makes all the difference. *Hosty*, 412 F.3d at 734.

Nor, it is worth adding, does the university setting invariably mean that educators have less discretion over their curriculum and class-related speech. It may be true that university students can handle more mature themes, but it is also true that they are not forced to be there, something that cannot be said about most students at public high schools. A prospective university student has the capacity to learn what a curriculum requires before applying to the school and before matriculating there. When a university lays out a program's curriculum or a class's requirements for all to see, it is the rare day when a student can exercise a First Amendment veto over them.

*Hazelwood* also features a question crucial to the resolution of all school-speech cases, whether at the high school or university level: Whose speech is it? The closer expression comes to school-sponsored speech, the less likely the First Amendment protects it. *Hazelwood*, 484 U.S. at 271, 273. And the less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a "legitimate pedagogical concern[]," which is why the First Amendment permits suppression under those circumstances only if the speech causes "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. To be concrete, *Barnette* involved forced individual expression that happened to occur in a

school, while *Hazelwood* involved restricted student expression through the school's newspaper.

A university's control over curricular speech comes with one other limitation. Although educators may "limit[]" or "grade[] speech in the classroom in the name of learning," and although they may control their own speech and curriculum, the First Amendment does not permit educators to invoke curriculum "as a pretext for punishing [a] student for her . . . religion." *Settle*, 53 F.3d at 155. Even in the context of a secular university, religious speech is still speech, and discriminating against the religious views of a student is not a legitimate end of a public school. *See Axson-Flynn*, 356 F.3d at 1293.

B.

Gauged by these requirements, Ward's free-speech claim deserves to go to a jury. Although the university submits it dismissed Ward from the program because her request for a referral violated the ACA code of ethics, a reasonable jury could find otherwise—that the code of ethics contains no such bar and that the university deployed it as a pretext for punishing Ward's religious views and speech.

The ACA code of ethics, in the first place, does not prohibit values-based referrals like the one Ward requested. Consider the two provisions Ward allegedly violated. The first one says:

> Counselors [1] are aware of their own values, attitudes, beliefs, and behaviors and [2] avoid imposing values that are inconsistent with counseling goals. [3] Counselors respect the diversity of clients, trainees, and research participants.

R. 1-4 at 2. What exactly did Ward do wrong in making the referral request? If one thing is clear after three years of classes, it is that Ward is acutely aware of her own values. The point of the referral request was to *avoid* imposing her values on gay and lesbian clients. And the referral request not only respected the diversity of practicum clients, but it also conveyed her willingness to counsel gay and lesbian clients about other issues—all but relationship issues—an attitude confirmed by her equivalent

concern about counseling heterosexual clients about extra-marital sex and adultery in a values-affirming way.

> The second provision says:
>
> Counselors [1] do not condone or engage in discrimination based on age, culture, disability, ethnicity, race, religion/spirituality, gender, gender identity, sexual orientation, marital status/partnership, language preference, socioeconomic status, or any basis proscribed by law. [2] Counselors do not discriminate against clients, students, employees, supervisees, or research participants in a manner that has a negative impact on these persons.

R. 14-7 at 59. Here too, what did Ward do wrong? Ward was willing to work with all clients and to respect the school's affirmation directives in doing so. That is why she asked to refer gay and lesbian clients (and some heterosexual clients) if the conversation required her to affirm their sexual practices. What more could the rule require? Surely, for example, the ban on discrimination against clients based on their religion (1) does not require a Muslim counselor to tell a Jewish client that his religious beliefs are correct if the conversation takes a turn in that direction and (2) does not require an atheist counselor to tell a person of faith that there is a God if the client is wrestling with faith-based issues. Tolerance is a two-way street. Otherwise, the rule mandates orthodoxy, not anti-discrimination.

Nor did the referral request have a "negative impact" on the client. Quite the opposite, as the client never knew about the referral and perhaps received better counseling than Ward could have provided.

Not only did Ward's referral request respect these provisions, but another provision of the code of ethics expressly permits values-based referrals. "If counselors determine an inability to be of professional assistance to clients," the code says that they may refer them. R. 14-7 at 50. As a specific application of this principle, one implicating secular and faith-based values, the code allows counselors to "choose to work or not work with terminally ill clients who wish to explore their end-of-life options." R. 14-7 at 49. Consistent with these provisions, Ward's expert, Dr. E. Warren

Throckmorton, the former chairman of the American Mental Health Counselors Association's ethics committee (and a former president of the organization), said that Ward's request to refer this client complied with the code.

Several of the textbooks used in Ward's classes likewise say that sound counseling practices permit values-based referrals. One textbook, *Interviewing and Change Strategies for Helpers*, says that "some value judgments by both helper and client may be inevitable . . . . If the client selects goals that severely conflict with the helper's values . . . the helper may decide to refer the client." R. 79-5 at 6. Another textbook, *Becoming a Helper*, says that "the assumption that counseling is value-neutral is no longer tenable," R. 79-3 at 8, and quotes a 2003 study finding that some forty percent of professional counselors have referred clients due to values conflicts over sexual practices.

Even the university's expert, Dr. David Kaplan, the American Counseling Association's Chief Professional Officer, was not of one mind on the point. He said one thing in his expert report—that "refusing to counsel someone on issues related to sexual orientation is a clear and major violation of the . . . ACA Code of Ethics." R. 82-9 at 5. But he said something else in another forum—that many professional counselors are willing to refer clients "at the drop of a hat" and that he knows many counselors who refer gay and lesbian clients when they want to talk about their relationships. R. 99-2.

That the code of ethics permits referrals is consistent with a separate policy of the ACA, also embraced by the university and also supportive of referrals. The ACA discourages conversion therapy—helping a client convert from one sexual orientation to another—on the theory that it is unproven and may do more harm than good for a client. In view of this policy, it makes sense to allow a student, concerned about her capacity to stay neutral if a client shows an interest in conversion therapy, to refer clients seeking such therapy. Several professors said that a student counselor would be permitted to make such a referral. *See* Francis Dep., R. 82-7 at 91-93; Dugger Dep., R. 82-6 at 80-81.

No matter what the code of ethics means and no matter how it has been interpreted, the university defendants respond that the school had a different policy for practicum students—a "blanket rule" that they could not refer any clients. Reply Br. at 13. But a reasonable jury could find that this was an after-the-fact invention. The university cannot point to any policy articulated in its course materials, the student handbook or anything else forbidding practicum students from making referrals. The student manual, to the contrary, includes a chapter dedicated to "Referrals," R. 14-9 at 15, which says that students "may at times need to refer a client for additional counseling services outside the Counseling Clinic" and encourages students "to first consult with their Faculty Supervisor for assistance in making the referral." *Id.*

At no point did any professor tell Ward about a no-referral policy—not during the informal review, not during the formal review, not even in the letter dismissing her from the program. Worse, there are at least two settings where the university permits students—in practicum—to have a say over whom they counsel. The school permits students to request certain types of clients to counsel—what you might call a yes-referral policy—and the school will honor the request. *See* R. 82-7 at 43–45. Why a school would honor student requests to counsel clients with certain types of problems but refuse requests not to counsel clients with certain types of problems is not self-evident. The record confirms at least one instance, moreover, when the school *permitted* a practicum referral, allowing a grieving student to refrain from counseling a grieving client. *See id.* at 45–46. The university demurs, claiming this was not a "referral" but a "single incident of non-assignment." Reply Br. at 10. No matter the label, the incident calls into question the basis for the university's actions. At the very least, it shows that the counseling department was willing to avoid unsuitable student-client matches in some instances. Why treat Ward differently? That her conflict arose from religious convictions is not a good answer; that her conflict arose from religious convictions for which the department at times showed little tolerance is a worse answer.

On top of the absence of a written policy barring referrals in the practicum class, there is plenty of evidence that the only policy governing practicum students was the

ACA code of ethics, which as shown contemplates referrals. Ward says that her professors told her that "when you get to practicum, you're supposed to use everything that has been taught to you in previous courses," including the code of ethics. R. 69-3 at 137. The professors do not say otherwise. During the formal review, Callaway explained that "students have the same obligation to clients as those required of professional counselors" and that "[c]ounselors in training have a responsibility to understand and follow the ACA code of ethics." R. 1-5 at 2. Dugger concurred: "[A]ll students in [the] counseling program are informed . . . that they are expected to adhere to the ACA code of ethics. Ms. Ward . . . would also have been informed of this via the practicum manual." *Id*. at 5. Based on the professors' and Ward's statements, a reasonable jury could conclude that practicum students were required to follow the written code of ethics, not an unwritten (yet-to-be-enforced) no-referrals policy. The epitome of a pretextual explanation for a student's expulsion is a reason never expressed or invoked before.

A reasonable jury also could find evidence of religious-speech discrimination from the formal review. The inquiry was not a model of dispassion. Many of the participants' comments and questions focused on Ward's beliefs and her religious objection to affirming same-sex relationships. Professor Dugger said that Ward "communicated an attempt to maintain [her] belief system and [her] behaviors," *id*. at 8, and dismissed the religious basis of Ward's objections: She offered her "professional opinion" that Ward was "selectively using her religious beliefs in order to rationalize her discrimination against one group of people" because Ward said that she could "set aside her religious values" and counsel clients about things such as "abortion, child abuse, and murder" but "could not set aside her religious values in order to effectively counsel non-heterosexual clients." *Id*. at 5–6. This line of inquiry suggests a distinction between secular values and spiritual ones, with a preference for the former over the latter. Besides, the reason why Ward (in Professor Dugger's words) could "set aside her religious values" in counseling clients about "abortion, child abuse, and murder" is because the university likely would not insist that she affirm the values underlying this conduct.

Pressing these points, Dugger asked Ward whether she would "see [her] brand of Christianity as superior to" that of a Christian client who viewed her faith differently. *Id.* at 28. In the same vein, Professor Marx queried "how someone with such strong religious beliefs [as Ward's] would enter a profession that would cause [her] to go against those beliefs . . . by its stated code of ethics." *Id.* at 31. And Professor Francis took Ward "on a little bit of a theological bout," *id.* at 28, asking whether she believed that "anyone [is] more righteous than another before God?" and whether, if Ward's stated beliefs were true, "doesn't that mean that you're all on the same boat and shouldn't [gays and lesbians] be accorded the same respect and honor that God would give them?" *Id.* at 29.

These statements represent the contemporaneous thoughts of the decision-makers who dismissed Ward, and they permit the inference that Ward's religious beliefs motivated their actions, particularly in the absence of a formal policy barring referrals. A recent decision from the Tenth Circuit helps to show why. Christina Axson-Flynn was a student in the University of Utah's actor training program. *Axson-Flynn*, 356 F.3d at 1280. As a Mormon, she refused to say aloud portions of scripts that used curse words or took the Lord's name in vain. *Id.* at 1281. Faculty members pushed back. They told her that she should "talk to some other Mormon girls who are good Mormons, who don't have a problem with" adhering to scripts as written, and that she would either have to "modify [her] values" or leave the program. *Id.* at 1282. The Tenth Circuit held that the faculty members' statements created "a genuine issue of material fact as to whether [their] justification for script adherence was truly pedagogical or whether it was a pretext for religious discrimination." *Id.* at 1293.

The same is true here. Many of the faculty members' statements to Ward raise a similar concern about religious discrimination. A reasonable jury could find that the university dismissed Ward from its counseling program because of her faith-based speech, not because of any legitimate pedagogical objective. A university cannot compel a student to alter or violate her belief systems based on a phantom policy as the price for obtaining a degree. *Cf. Barnette*, 319 U.S. at 642.

III.

Ward independently claims that the University "prohibit[ed] the free exercise" of her "religio[us]" faith. U.S. Const. amend. I.  Under this guarantee, public authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process.  That is why Oregon could deny unemployment benefits to two members of a Native American tribe found guilty of using a proscribed drug, peyote, even when they used the substance for sacramental purposes.  *Employment Div. v. Smith*, 494 U.S. 872, 890 (1990).  The rule comes with an exception.  If the law appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting a belief or a faith-based practice, the law satisfies the First Amendment only if it "advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  That is why the City of Hialeah (Florida) could not enforce ordinances that purported to be neutral and generally applicable on their face—regulating the keeping and killing of animals—but in practice targeted the adherents of one faith (the Santeria religion) and the actions of one faith (animal sacrifices).  *Id*. at 524–25, 533–35.

The exception rather than the rule governs Ward's case.  On its face, the ACA code of ethics sets forth neutral and generally applicable policies, and the university has ample authority to adopt these policies, including the anti-discrimination provisions, for the school's graduate counseling program.  What poses a problem is not the adoption of an anti-discrimination policy; it is the implementation of the policy, permitting secular exemptions but not religious ones and failing to apply the policy in an even-handed, much less a faith-neutral, manner to Ward.

The university defendants, as shown, cannot point to *any* written policy that barred Ward from requesting this referral.  Not the code of ethics, not the school's anti-discrimination policy, not even the course description of the practicum—none of the natural havens for such a written policy contains one.

Considerable evidence, as also shown, suggests that the ethics code *permits* values-based referrals. According to the university's textbooks, Ward's expert (Dr. Throckmorton) and even to *some* of the writings of the university's expert (Dr. Kaplan), such referrals are not out of custom but have become de rigueur. That is particularly true in the context of values conflicts about sexual practices, where one study indicated that forty percent of counselors had referred clients on this basis. Corey & Corey, *Becoming a Helper* (5th ed. 2007) at 235–36, R. 79-4 at 6-7. Several professors also testified that a counselor would be permitted, if not encouraged, to refer a gay or lesbian client seeking conversion therapy. *See* Francis Dep., R. 82-7 at 91–93; Dugger Dep., R. 82-6 at 80–81.

The code of ethics also expressly permits counselors to refer "terminally ill clients who wish to explore their end-of-life options." R. 14-7 at 49. This is because, as the code acknowledges, "end-of-life decisions" involve weighty "personal" and "moral" issues. *Id.* Yet end-of-life decisions are heavily influenced by one's "religion/spirituality" and one's "culture," each of which is covered by the anti-discrimination policy. R. 14-7 at 59. Such decisions surely come within Professor Callaway's broad definition of the term "culture," which she interprets to mean "the way we see things, the way we do things, what seems normal to us." Callaway Dep., R. 82-5 at 42. To refer a client who, due to his religion or culture, seeks to end his life in a particular way would seem to run afoul of the anti-discrimination policy to the same degree that Ward's actions in this case ran afoul of the policy. Yet the university permits one referral but not the other.

Counselors likewise may turn away—refer—clients who cannot pay for their services. *See* Dugger Dep., R. 82-6 at 58–59; Francis Dep., R. 82-7 at 64. Understandable though that policy may be, it appears to violate another feature of the ethics code, which forbids discrimination based on "socioeconomic status." R. 14-7 at 59. The policy thus seems to permit referrals for secular—indeed mundane—reasons, but not for faith-based reasons.

Even if the code of ethics permitted Ward's referral request, the University says that the department had a policy of disallowing *any* referrals during practicum. Where? The record, as shown, contains no evidence of such a policy. The university cannot point to any articulation of it *before* Ward's enrollment in the practicum. And if such a policy existed, why didn't Ward's instructor tell her about it when Ward made the request and why did the instructor *permit* the referral? Ample evidence supports the theory that no such policy existed—until Ward asked for a referral on faith-based grounds.

This ad hoc application of the anti-discrimination policy stands in marked contrast to *Kissinger v. Board of Trustees of Ohio State University*, 5 F.3d 177 (6th Cir. 1993), where we rejected a veterinary student's free-exercise challenge to a requirement that she complete a course in which students had to operate on live animals. *Id.* at 180–81. Unlike the university's *sotto voce* referral policy, the veterinary program in *Kissinger* advised all matriculating students that they would be required to operate on live animals and the policy was neutral and generally applicable. The complaining student could not identify any circumstances in which a student was allowed, or would be allowed, to graduate without completing the course. *Id.* at 179–81.

At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny. *See Smith*, 494 U.S. at 884; *Lukumi Babalu*, 508 U.S. at 537. A double standard is not a neutral standard. *See Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365–67 (3d Cir. 1999) (Alito, J.) (invalidating a police department policy that barred officers from growing beards and holding that the policy could not take refuge in the *Smith* safe harbor because it excepted officers who could not shave for medical reasons but not officers who could not shave for religious reasons).

The university does not argue that its actions can withstand strict scrutiny, and we agree. Whatever interest the university served by expelling Ward, it falls short of compelling. Allowing a referral would be in the best interest of Ward (who could

counsel someone she is better able to assist) and the client (who would receive treatment from a counselor better suited to discuss his relationship issues). The multiple types of referrals tolerated by the counseling profession severely undermine the university's interest in expelling Ward for the referral she requested. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 432–37 (2006). Neither does the unsubstantiated possibility that the counseling program could lose its accreditation provide a compelling interest. Other than generalized statements that the program must teach the ACA code of ethics in order to maintain accreditation (the same code that contemplates values-based referrals), there is no concrete evidence that Ward's referral request placed the program's accreditation in danger. A compelling interest demands more. *See id.* at 437–38 (the government's generalized assertion that allowing religious use of hoasca, a sacramental tea that contains a hallucinogenic substance, would violate international treaty obligations did not establish a sufficiently compelling interest).

IV.

None of this means that Ward should win as a matter of law with respect to her free-speech and free-exercise claims. In view of the university's claim that a no-referral policy existed for the practicum class, supported by the testimony of several professors and administrators, and in view of the reality that the purported policy arises in the context of a university's curriculum and *its* counseling services, the district court properly rejected Ward's cross-motion for summary judgment. Construing the evidence in the university's favor, a jury might credit the university's claim that such a policy existed and conclude that practicum students were subject to a general ban on referrals, making it difficult for Ward to demonstrate that she was expelled on pretextual grounds as opposed to the ground that she refused to adhere to a general and reasonable curricular requirement. Just as the inferences favor Ward in the one setting, they favor the university defendants in the other. At this stage of the case and on this record, neither side deserves to win as a matter of law.

V.

A recent decision of the Eleventh Circuit, when read together with our decision, helps to illustrate the permissible and impermissible ways to handle the vexing issues that occasionally arise in enforcing anti-discrimination policies through a school curriculum. Also at issue in *Keeton v. Anderson-Wiley*, ___ F.3d ___, No. 10-13925, 2011 WL 6275932 (11th Cir. Dec. 16, 2011), was a graduate-level counseling program and the school's enforcement of an anti-discrimination policy in the context of a claim of discrimination based on sexual orientation. The Eleventh Circuit ruled for Augusta State University, rejecting a student's appeal of a preliminary-injunction decision in which the trial court refused to require the school to re-admit her after she refused to complete a remediation plan. *Id.* at *13.

At one level, the two decisions look like polar opposites, as a student loses one case and wins the other. But there is less tension, or for that matter even disagreement, between the two cases than initially meets the eye. The procedural settings of the two cases differ. In *Keeton*, the district court made preliminary fact findings after holding a hearing in which both sides introduced evidence in support of their claims. *Id.* at *1–2. Not only are there no trial-level fact findings here, but Ward also gets the benefit of all reasonable factual inferences in challenging the summary-judgment decision entered against her.

The two claimants' theories of constitutional protection also are miles apart. Keeton insisted on a constitutional right to engage in conversion therapy—that is, if a "client discloses that he is gay, it was her intention to tell the client that his behavior is morally wrong and then try to change the client's behavior." *Id.* at *2. That approach, all agree, violates the ACA code of ethics by imposing a counselor's values on a client, a form of conduct the university is free to prohibit as part of its curriculum. Instead of insisting on changing her clients, Ward asked only that the university not change her—that it permit her to refer some clients in some settings, an approach the code of ethics appears to permit and that no written school policy prohibits. Nothing in *Keeton* indicates that Augusta State applied the prohibition on imposing a counselor's values on

the client in anything but an even-handed manner.  Not so here, as the code of ethics, counseling norms, even the university's own practices, seem to permit the one thing Ward sought:  a referral.

The two decisions in the end share the same essential framework and reasoning.  They both apply *Hazelwood* to curricular speech at the university level, and they both show that the even-handed enforcement of a neutral policy is likely to steer clear of the First Amendment's free-speech and free-exercise protections.  Both decisions also are consistent with *Christian Legal Society*, which considered whether a Christian organization at a law school could insist that its members adhere to certain faith-based codes of conduct.  130 S. Ct. at 2978.  The Court held that the law school's anti-discrimination policy, requiring registered student organizations to accept all comers, did not violate the First Amendment on its face, yet it remanded the case to determine whether the school selectively enforced the policy against some organizations but not others.  *Id.* at 2994–95.  While *Keeton* involved Augusta State's across-the-board application of an ethical rule that prohibits counselors from imposing their values on clients, today's case reveals evidence that Eastern Michigan University selectively enforced a no-referral policy against Ward.

VI.

That leaves two loose ends.  The university defendants cross-appeal the district court's decision denying them qualified immunity.  Qualified immunity shields government officials from monetary damages, not from injunctive relief, *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wood v. Strickland*, 420 U.S. 308, 314 n.6 (1975), and Ward asks for both.  There is no basis for dismissing the injunction claims against the university defendants.  As for the money-damages claims, the question is whether the university defendants violated "clearly established . . . constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818.  If the jury finds that the university dismissed Ward from the counseling program because of hostility to her religious speech and beliefs, that violates clearly established free-exercise and free-

speech rights. *See Christian Legal Soc'y*, 130 S. Ct. at 2987; *Lukumi Babalu*, 508 U.S. at 532; *Settle*, 53 F.3d at 155.

Ward also appeals the district court's dismissal of her official-capacity claims against the university's President and the members of the Board of Regents. The district court dismissed these defendants because they did not play a meaningful role in Ward's dismissal. On appeal, Ward has not shown otherwise. The problem in this case is not a facially unconstitutional policy, as Ward submits, but the potentially improper implementation of that policy by some members of the university and not others. The district court properly accounted for this distinction.

## VII.

For these reasons, we reverse and remand to the district court for further proceedings.