RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARYVILLE BAPTIST CHURCH, INC.; DR. JACK
ROBERTS,

        *Plaintiffs-Appellants*,

    *v.*

ANDY BESHEAR, in his official capacity as Governor
of the Commonwealth of Kentucky,

        *Defendant-Appellee*.

No. 20-5427

───────────────

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:20-cv-00278—David J. Hale, District Judge.

Decided and Filed: May 2, 2020[*]

Before: SUTTON, McKEAGUE, and NALBANDIAN, Circuit Judges.

───────────────

#### COUNSEL

**ON BRIEFS:** Matthew D. Staver, Horatio G. Mihet, Roger K. Gannam, LIBERTY COUNSEL, Orlando, Florida, for Appellants; Carmine G. Iaccarino, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Amicus Curiae in support of Appellants. S. Travis Mayo, OFFICE OF THE GOVERNOR, Frankfort, Kentucky, for Appellee; Richard B. Katskee, Alex J. Luchenitser, AMERCIANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amicus Curiae in support of Appellee.

───────────────

[*]This decision was originally filed as an unpublished order on May 2, 2020. The court has now designated the order for publication.

_____

**ORDER**

_____

PER CURIAM.  Maryville Baptist Church and its pastor, Dr. Jack Roberts, appeal the district court's order denying their emergency motion for a temporary restraining order.  The Church claims that the district court's order effectively denied their motion for a preliminary injunction to stop Governor Andy Beshear and other Commonwealth officials from enforcing and applying two COVID-19 orders.  The orders, according to the Church, prohibit its members from gathering for drive-in and in-person worship services regardless of whether they meet or exceed the social distancing and hygiene guidelines in place for permitted commercial and other non-religious activities.  The Church moves for an injunction pending appeal, which the Attorney General supports as amicus curiae.  The Governor opposes the motion.

Governor Beshear issued two pertinent COVID-19 orders.  The first order, issued on March 19, prohibits "[a]ll mass gatherings," "including, but not limited to, community, civic, public, leisure, faith-based, or sporting events."  R. 1-5 at 1.  It excepts "normal operations at airports, bus and train stations, . . . shopping malls and centers," and "typical office environments, factories, or retail or grocery stores where large numbers of people are present, but maintain appropriate social distancing."  *Id.*

The second order, issued on March 25, requires organizations that are not "life-sustaining" to close.  R. 1-7 at 2.  According to the order, religious organizations are not "life-sustaining" organizations, except when they function as charities by providing "food, shelter, and social services."  *Id.* at 3.  Laundromats, accounting services, law firms, hardware stores, and many other entities count as life-sustaining.

On April 12, Maryville Baptist Church held a drive-in Easter service.  Congregants parked their cars in the church's parking lot and listened to a sermon over a loudspeaker.  Kentucky State Police arrived in the parking lot and issued notices to the congregants that their attendance at the drive-in service amounted to a criminal act.  The officers recorded congregants'

license plate numbers and sent letters to vehicle owners requiring them to self-quarantine for 14 days or be subject to further sanction.

The Church says these orders and enforcement actions violate its congregants' rights under Kentucky's Religious Freedom Restoration Act and the free-exercise guarantee of the First and Fourteenth Amendments to the U.S. Constitution.

We have jurisdiction over the appeal. "Interlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions" are immediately appealable. 28 U.S.C. § 1292(a)(1). As a general rule, we do not entertain appeals from a district court's decision to grant or deny a temporary restraining order. That's because temporary restraining orders are usually "of short duration and usually terminate with a prompt ruling on a preliminary injunction, from which the losing party has an immediate right of appeal." *Ne. Ohio Coal. for the Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1005 (6th Cir. 2006). But usually is not always, and the label a district court attaches to an order does not control. When an order "has the practical effect of an injunction," *id.*, and an appeal "further[s] the statutory purpose of permit[ting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence," *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981), we will review it. We also tend to wait until the claimant seeks a stay from the district court, and the court rules on it. Claimants sought a stay on April 30. The district court has not yet ruled. But one explanation for the stay motion is tomorrow's Sunday service. Under these circumstances, no one can fairly doubt that time is of the essence. The case will become moot just over three Sundays from now, May 20, when the Governor has agreed to permit places of worship to reopen. And the district court's order has the practical effect of denying the Church's motion for a preliminary injunction, especially if no service, whether drive-in or in-person, is allowed in the interim.

We review four factors when evaluating whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation omitted).

*Likelihood of success.*   The Church is likely to succeed on its state and federal claims, especially with respect to the ban's application to drive-in services.  Start with the claim under Commonwealth law—Kentucky's Religious Freedom Restoration Act.  "Government shall not substantially burden" a person's "right to act . . . in a manner motivated by a sincerely held religious belief," it guarantees, "unless the government proves by clear and convincing evidence" that it "has used the least restrictive means" to further "a compelling governmental interest in infringing the specific act."  Ky. Rev. Stat. § 446.350.  The point of the law is to exercise an authority every State has:  to provide more protection for religious liberties at the state level than the U.S. Constitution provides at the national level.  In this instance, the purpose of the Kentucky RFRA is to provide more protection than the free-exercise guarantee of the First Amendment, as interpreted by *Employment Division v. Smith*, 494 U.S. 872 (1990).  The Kentucky requirements parallel in large measure the RFRAs enacted by other States and one enacted by Congress, all of which share the goal of imposing strict scrutiny on laws that burden sincerely motivated religious practices.  *See, e.g.*, Tex. Civ. Prac. & Rem. § 110.003; *see* 42 U.S.C. § 2000bb-1.

Application of this test requires little elaboration in most respects.  The Governor's actions substantially burden the congregants' sincerely held religious practices—and plainly so.  Religion motivates the worship services.  And no one disputes the Church's sincerity.  Orders prohibiting religious gatherings, enforced by police officers telling congregants they violated a criminal law and by officers taking down license plate numbers, amount to a significant burden on worship gatherings.  *See Gonzales v. O Centro Espirita Beneficiente Uniao*, 546 U.S. 418, 428–32 (2006); *Barr v. City of Sinton*, 295 S.W.3d 287, 301 (Tex. 2009).  At the same time, the Governor has a compelling interest in preventing the spread of a novel, highly contagious, sometimes fatal virus.  All accept these conclusions.

The likelihood-of-success inquiry instead turns on whether Governor Beshear's orders were "the least restrictive means" of achieving these public health interests.  Ky. Rev. Stat. § 446.350.  That's a difficult hill to climb, and it was never meant to be anything less.  *See Barr*, 295 S.W.3d at 289; *Holt v. Hobbs*, 574 U.S. 352, 364 (2015).  The way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches.  The orders permit uninterrupted functioning of

"typical office environments," R. 1-5 at 1, which presumably includes business meetings. How are in-person meetings with social distancing any different from drive-in church services with social distancing? Kentucky permits the meetings and bans the services, even though the open-air services would seem to present a lower health risk. The orders likewise permit parking in parking lots with no limit on the number of cars or the length of time they are there so long as they are not listening to a church service. On the same Easter Sunday that police officers informed congregants they were violating criminal laws by sitting in their cars in a parking lot, hundreds of cars were parked in grocery store parking lots less than a mile from the church. The orders permit big-lot parking for secular purposes, just not for religious purposes. All in all, the Governor did not narrowly tailor the order's impact on religious exercise.

In responding to the state and federal claims, the Governor denies that the ban applies to drive-in worship services, and the district court seemed to think so as well. But that is not what the Governor's orders say. By their terms, they apply to "[a]ll mass gatherings," "including, but not limited to, . . . faith-based . . . events." R. 1-5 at 1. In deciding to open up faith-based events on May 20, and to permit other events before then such as car washes and dog grooming, *see Healthy at Work: Phase 1 Reopening*, https://govstatus.egov.com/ky-healthy-at-work (last visited May 2, 2020), the Governor did not say that drive-in services are exempt. And that is not what the Governor has done anyway. Consistent with the Governor's threats on Good Friday, state troopers came to the Church's Easter service, told congregants that they were in violation of a criminal law, and took down the license plate numbers of everyone there, whether they had participated in a drive-in or in-person service.

It bears noting that neither the Governor nor the Attorney General has raised sovereign immunity as a defense to this claim. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). That is within their rights, *see Wis. Dep't. of Corr. v. Schacht*, 524 U.S. 381, 389 (1998), and perhaps springs from a commendable recognition that, with or without a pandemic, no one wants to ignore state law in creating or enforcing these orders.

The Governor's orders also likely "prohibit[] the free exercise" of "religion" in violation of the First and Fourteenth Amendments, especially with respect to drive-in services. U.S. Const amends. I, XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). On the one hand, a

generally applicable law that incidentally burdens religious practices usually will be upheld. *See Smith*, 494 U.S. at 878–79; *New Doe Child #1 v. Congress of the United States*, 891 F.3d 578, 591–93 (6th Cir. 2018). On the other hand, a law that discriminates against religious practices usually will be invalidated unless the law "is justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520, 553 (1993).

Discriminatory laws come in many forms. Outright bans on religious activity alone obviously count. So do general bans that cover religious activity when there are exceptions for comparable secular activities. *See Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012); *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365–67 (3d Cir. 1999). As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law. *Ward*, 667 F.3d at 738. "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 740. As just shown, the Governor's orders do not seem to survive strict scrutiny, particularly with respect to the ban on outdoor services. The question, then, is one of general applicability.

The Governor's orders have several potential hallmarks of discrimination. One is that they prohibit "faith-based" mass gatherings by name. R. 1-5 at 1. But this does not suffice by itself to show that the Governor singled out faith groups for disparate treatment. The order lists many other group activities, and we accept the Governor's submission that he needed to mention faith groups by name because there are many of them, they meet regularly, and their ubiquity poses material risks of contagion.

The real question goes to exceptions. The Governor insists at the outset that there are "no exceptions at all." Appellee Br. at 21. But that is word play. The orders allow "life-sustaining" operations and don't include worship services in that definition. And many of the serial exemptions for secular activities pose comparable public health risks to worship services. For example: The exception for "life-sustaining" businesses allows law firms, laundromats, liquor stores, and gun shops to continue to operate so long as they follow social-distancing and other

health-related precautions.  R. 1-7 at 2–6.  But the orders do not permit soul-sustaining group services of faith organizations, even if the groups adhere to all the public health guidelines required of essential services and even when they meet outdoors.

We don't doubt the Governor's sincerity in trying to do his level best to lessen the spread of the virus or his authority to protect the Commonwealth's citizens.  *See Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905).  And we agree that no one, whether a person of faith or not, has a right "to expose the community . . . to communicable disease."  *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944).  But restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom.  Assuming all of the same precautions are taken, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers?  Why can someone safely walk down a grocery store aisle but not a pew?  And why can someone safely interact with a brave deliverywoman but not with a stoic minister?  The Commonwealth has no good answers.  While the law may take periodic naps during a pandemic, we will not let it sleep through one.

Sure, the Church might use Zoom services or the like, as so many places of worship have decided to do over the last two months.  But who is to say that every member of the congregation has access to the necessary technology to make that work?  Or to say that every member of the congregation must see it as an adequate substitute for what it means when "two or three gather in my Name."  Matthew 18:20; *see also On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-CV-264-JRW, 2020 WL 1820249, at *7–8 (W.D. Ky. Apr. 11, 2020).  As individuals, we have some sympathy for Governor DeWine's approach—to allow places of worship in Ohio to hold services but then to admonish them all (we assume) that it's "not Christian" to hold in-person services during a pandemic.  Doral Chenoweth III, *Video: Dewine says it's "not Christian" to hold church during coronavirus*, Columbus Dispatch, April 1, 2020.  But this is not about sympathy.  And it's exactly what the federal courts are not to judge—how individuals comply with their own faith as they see it.  *Smith*, 494 U.S. at 886–87.

Keep in mind that the Church and Dr. Roberts do not seek to insulate themselves from the Commonwealth's general public health guidelines.  They simply wish to incorporate them into their worship services.  They are willing to practice social distancing.  They are willing to

follow any hygiene requirements.  They are not asking to share a chalice.  The Governor has offered no good reason so far for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same.  Are they not often the same people, going to work on one day and attending worship on another?  If any group fails, as assuredly some groups have failed in the past, the Governor is free to enforce the social-distancing rules against them for that reason.

The Governor claims, and the district court seemed to think so too, that the explanation for these groups of people to be in the same area—intentional worship—distinguishes them from groups of people in a parking lot or a retail store or an airport or some other place where the orders allow many people to be.  We doubt that the reason a group of people go to one place has anything to do with it.  Risks of contagion turn on social interaction in close quarters; the virus does not care why they are there.  So long as that is the case, why do the orders permit people who practice social distancing and good hygiene in one place but not another?  If the problem is numbers, and risks that grow with greater numbers, then there is a straightforward remedy:  limit the number of people who can attend a service at one time.

*Other factors.*  Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam).  That's true here with respect to the ban on drive-in worship services.  As for harm to the claimants, the prohibition on attending any worship service this Sunday and the Sundays through May 20 assuredly inflicts irreparable harm. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001).  As for harm to others, an injunction appropriately permits religious services with the same risk-minimizing precautions as similar secular activities, and permits the Governor to enforce social-distancing rules in both settings.  As for the public interest, treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees. *See Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012).

The balance is more difficult when it comes to in-person services.  Allowance for drive-in services this Sunday mitigates some harm to the congregants and the Church.  In view of the

fast-moving pace of this litigation and in view of the lack of additional input from the district court, whether of a fact-finding dimension or not, we are inclined not to extend the injunction to in-person services at this point.  We realize that this falls short of everything the Church has asked for and much of what it wants.  But that is all we are comfortable doing after the 24 hours the plaintiffs have given us with this case.  In the near term, we urge the district court to prioritize resolution of the claims in view of the looming May 20 date and for the Governor and plaintiffs to consider acceptable alternatives.  The breadth of the ban on religious services, together with a haven for numerous secular exceptions, should give pause to anyone who prizes religious freedom.  But it's not always easy to decide what is Caesar's and what is God's—and that's assuredly true in the context of a pandemic.

Accordingly, the plaintiffs' motion for an injunction pending appeal, and their motion to expedite briefing, oral argument and submission on the briefs, is **GRANTED IN PART**.  The Governor and all other Commonwealth officials are hereby enjoined, during the pendency of this appeal, from enforcing orders prohibiting drive-in services at the Maryville Baptist Church if the Church, its ministers, and its congregants adhere to the public health requirements mandated for "life-sustaining" entities.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk