**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK L. OYAMA,
*Plaintiff-Appellant*,

v.

UNIVERSITY OF HAWAII; CHRISTINE
SORENSEN; JEFFREY MONIZ; JOHN
DOES, 1–25; JANE DOES, 1–25,
*Defendants-Appellees*.

No. 13-16524

D.C. No.
1:12-cv-00137-
HG-BMK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen W. Gillmor, Senior District Judge, Presiding

Argued and Submitted
June 9, 2015—Honolulu, Hawaii

Filed December 29, 2015

Before: Kim McLane Wardlaw, Marsha S. Berzon,
and John B. Owens, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's summary judgment in an action brought by a secondary education candidate alleging that the University of Hawaii's denial of his application to become a student teacher on the basis of his speech violated his First Amendment and due process rights.

The panel held that in the context of a public university's professional certification program, the university may evaluate a student's speech, made in the course of the program, in determining the student's eligibility for certification without offending the First Amendment under certain circumstances. In this case, because the University of Hawaii's decision to deny plaintiff's student teaching application directly related to defined and established professional standards, was narrowly tailored to serve the University's core mission of evaluating plaintiff's suitability for teaching, and reflected reasonable professional judgment, the University did not violate plaintiff's First Amendment rights. In addition, because the University granted plaintiff adequate procedural protections in denying his student teaching application, it did not violate plaintiff's due process rights.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Eric A. Seitz (argued), Della Au Belatti, and Sarah R. Devine, Honolulu, Hawaii, for Plaintiff-Appellant.

Christine Tamashiro (argued), Darolyn H. Lendio, and Ryan M. Akamine, Honolulu, Hawaii, for Defendants-Appellees.

Greg Lukianoff, Philadelphia, Pennsylvania, for Amicus Curiae Foundation for Individual Rights in Education.

Eugene Volokh, UCLA School of Law, Los Angeles, California, for Amicus Curiae Student Press Law Center.

**OPINION**

WARDLAW, Circuit Judge:

The University of Hawaii denied secondary education candidate Mark L. Oyama's application to become a student teacher, a prerequisite for recommendation to the State of Hawaii's teacher certification board. This appeal from the district court's grant of summary judgment to the University implicates the constitutional balance between two prerogatives of a public university's professional certification program: promoting open discourse among its students and limiting certification to candidates suitable for entry into a particular profession. We must delineate the scope of the University's authority to deny a teaching candidate's student teaching application on the basis of the candidate's speech. We conclude that the University did not violate Oyama's First Amendment rights because its decision related directly to defined and established professional standards, was

narrowly tailored to serve the University's core mission of evaluating Oyama's suitability for teaching, and reflected reasonable professional judgment. In addition, because the University provided adequate procedural protections in denying Oyama's application, neither it nor its agents violated Oyama's procedural due process rights. We therefore affirm the district court's grant of summary judgment to the University.

## I.

Mark Oyama earned an undergraduate degree in mathematics from the California Institute of Technology, followed by a Master's Degree in physics from the University of Hawaii. He then enrolled in the University of Hawaii's post-baccalaureate secondary education certification program at Manoa.

### A. *Hawaii's Post-Baccalaureate Certificate in Secondary Education Program*

Under Hawaii law, "[n]o person shall serve as a half-time or full-time teacher in a public school without first having obtained a license." Haw. Rev. Stat. § 302A-805. The purpose of teacher licensing, or certification, is to "ensure that education professionals possess the appropriate training, preparation, and competencies for teaching." Univ. of Haw. at Manoa, *Secondary Teacher Education Program Handbook* 26 (rev. 2009) ("*Handbook*").

The University of Hawaii at Manoa is Hawaii's only nationally accredited institution that recommends students for certification as secondary school teachers. *Id.* at i. The University offers a Post-Baccalaureate Certificate in

Secondary Education (PBCSE) Program (the "Program") to students who have bachelor's degrees and wish to obtain certification as secondary school teachers.[1]  According to the Program's handbook, the Program's goal is "to employ and prepare educators who are knowledgeable, effective, and caring professionals." *Id.* at 8.  The "caring" component seeks to "advanc[e] social justice and overcom[e] both discrimination and oppression" and "requires a high level of professionalism demonstrated through ethical behavior, competence, reflection, fairness, respect for diversity, and a commitment to inclusion and social responsibility." *Id.* at 8–9.  The Program's requirements include coursework and one semester of student teaching.  Admission to the Program does not guarantee admission to student teaching.  Rather, students must submit a Student Teaching Application and must meet all student teaching requirements set forth in the Program's handbook.  For example, a student teacher must "[a]ct, speak, and dress like a teacher."

The Program's student teaching requirements reflect the many regulations and policies governing admission to the teaching profession in Hawaii.  First, the University must comply with the Hawaii Department of Education's policies and regulations.  Pursuant to Department of Education Policy No. 5600, for example, the University may approve candidates for student teaching only "upon verification . . . of their ability to function effectively in Department classrooms."  Second, the University must comply with the Hawaii Teacher Standards Board's (HTSB) teacher licensing

---

[1] The Program is a part of the College of Education at the University of Hawaii at Manoa.  For purposes of this appeal, it is not necessary to distinguish between the College of Education and the University. Accordingly, we refer to both as the "University."

and ethical standards.  HTSB standards require teachers to, among other things, protect student safety, create an inclusive learning environment for all students, and demonstrate professionalism.  Finally, the University is required to uphold the standards of its accrediting organization, the National Council for Accreditation of Teacher Education (NCATE). *See* Nat'l Council for Accreditation of Teacher Educ., *Standards for Professional Development Schools* 11 (2001) (explaining that accredited institutions must "develop criteria consistent with state and national standards for candidates' admission to and completion of the preparation program and make recommendations for candidate certification based on the standards").

## B.  Oyama's Performance in the PBCSE Program

In the summer of 2010, Oyama enrolled in the University's PBCSE Program.  Oyama began his coursework and completed a field experience practicum at a local middle school.   During this period, several faculty members separately contacted Program administrators to express their concerns about Oyama's suitability for the teaching profession.

Oyama's statements concerning sexual relationships between adults and children were of central concern to the faculty.  While taking Dr. Ratliffe's class on "Educational Psychology: Adolescence and Education," Oyama was assigned to write a reflection about a video entitled "Growing Up Online."  Oyama wrote:

> Personally, I think that online child predation should be legal, and find it ridiculous that one could be arrested for comments they make on

the Internet. I even think that real life child predation should be legal, provided that the child is consentual [sic]. Basically from my point of view, the age of consent should be either 0, or whatever age a child is when puberty begins.

When Dr. Ratliffe discussed these statements with Oyama, he said that "it would be fine" for a twelve-year-old student to have a "consensual" relationship with a teacher. When Dr. Ratliffe explained that state law would require Oyama to report such conduct, Oyama stated that he would obey the law and report the relationship, but still believed that such a "consensual" relationship was not wrong. Dr. Ratliffe contacted the Director of the Secondary Program, Dr. Moniz, about these statements, explaining that, while she did not "mind that [Oyama] has opinions that are different from other people's," she was concerned that Oyama "may not be aware of and in agreement with safety issues about the adolescents who will be in his care." She cautioned that, "because of his lack of sensitivity to and empathy with others and lack of self-awareness at this time, we should be very careful about accepting him as a teacher candidate."

Another concern stemmed from Oyama's comments about teaching students with disabilities. For example, in his class on "Educating Exceptional Students in Regular Classrooms – Secondary," Oyama expressed the belief that "if the disability is sufficiently severe and not of a physical nature . . . there is little benefit to inclusion for the disabled student" in the classroom environment. Oyama also wrote that it is not reasonable to expect secondary school teachers to have the "extremely diverse skillset" needed to teach the range of grade levels presented in a mainstream classroom

that includes students with learning disabilities.  In another assignment, Oyama asserted that nine of ten special education students he encountered were "fakers" and explained that he was "not convinced that many 'disabilities' are actual disabilities or medically-based neurological conditions, but are rather the crude opinions of psychologists and psychiatrists."  Mr. Siegel, Oyama's professor, informed Dr. Moniz of his "serious concerns regarding Mark Oyama entering the teaching profession."  Mr. Siegel also noted his concern to Oyama, clarifying that his concern was "not based on [Siegel's] opinion," but rather on legal standards and his understanding, "based on [his] 43 years as an educator," of the criteria schools consider in evaluating prospective teachers.[2]

Oyama's performance in a field experience program at a nearby middle school corroborated many of his professors' concerns.  In the Field Experience Evaluation Form, several dispositions are listed, which are evaluated as "unacceptable," "acceptable," or "target," the highest rating.[3]  Oyama received multiple ratings of "unacceptable" and no ratings of "target."  In the accompanying Observation/Participation Evaluation, Oyama received an "unacceptable" rating as to the ability to

---

[2] Oyama made several other statements that concerned his professors and which they relayed to Dr. Moniz.  One professor expressed concern that Oyama said that "he thinks about suicide every day."  Professors also criticized Oyama's teaching style, his inability to work collaboratively with others, and his unwillingness to accept suggestions from his colleagues and supervisors.

[3] The evaluation form states that "candidates *should demonstrate* overall ratings of 'acceptable' or 'target' by the end of the field experience; **ratings of 'unacceptable' may require a Plan of Assistance and/or result in a failing grade**" (emphasis and bold in original).

teach effectively, work collaboratively with colleagues, respond to suggestions from supervisors, and demonstrate the level of professionalism expected of middle school teachers. Oyama's supervising instructor, Dr. Irv King, concluded, "My overall impression is that Mark would not do well as a middle school teacher."

*C. Denial of Admission to the Student Teaching Program*

In January 2011, Oyama applied to the PBCSE Student Teaching Program. In a letter dated July 8, 2011, Dr. Moniz informed Oyama his application had been denied. While noting that Oyama had clearly met the "minimum" academic requirements, Dr. Moniz explained the University's "duty," pursuant to Department of Education Policy No. 5600, to "verify your overall ability to function effectively as a teacher in a Hawaii Department of Education school." Dr. Moniz noted that a "number of factors raised the College of Education's concern," specifying several bases for the University's decision. He explained:

> [T]he views you have expressed regarding students with disabilities and the appropriateness of sexual relations with minors were deemed not in alignment with standards set by the Hawaii Department of Education, the National Council for the Accreditation of Teachers (NCATE) and the Hawaii Teacher Standards Board (HTSB).

Dr. Moniz further explained that Oyama's "endorsement of sexual relationship[s] between adults and minors, as well as between teachers and students" was in tension with Hawaii Department of Education rules expressly prohibiting sexual

contact between teachers and students or minors, *see* Haw. Admin. Rules, § 8-54-9, and with the HTSB's requirement that teachers protect students' safety, *see* HTSB Code of Ethics, Principle I.  In sum, Dr. Moniz found that Oyama's understanding of sexual relationships between adults and minors, as well as between teachers and students, was contrary to the "legal and ethical guidelines imposed by the State."  Dr. Moniz wrote that "[s]uch a matter is serious enough in nature that, *taken alone*, [it] warrants a denial of you [sic] student teaching application" (emphasis added).

Dr. Moniz added, however, that "other issues . . . support the denial of your application."  He recounted several comments by Oyama that "demonstrated a lack of empathy and understanding of students with disabilities."  He noted that these comments, "along with your professor's assessment that you have been unable to demonstrate any sort of willingness to accommodate students with disabilities," were "in opposition" to HTSB and NCATE standards.  Dr. Moniz specifically discussed the inconsistency between, for example, Oyama's expressed view that "if a disability is sufficiently severe and not of a physical nature . . . there is little benefit to inclusion for the disabled student" and both an HTSB standard requiring teachers to "[p]rovide services to students in a nondiscriminatory manner" and an NCATE standard requiring teachers to demonstrate professional dispositions necessary to teach "all students," including those "with exceptionalities."  Oyama had therefore been unable to demonstrate the requisite Professional Disposition to enter the teaching profession.

Finally, citing the HTSB's "right to deny licensing to teachers who exhibit any behavior that is [in] opposition to the standards and ethics imposed by the State," Dr. Moniz

noted the "unacceptable" ratings in Oyama's field experience evaluation, which corroborated Oyama's professors' concerns. Dr. Moniz concluded, "[W]e are not able to verify your overall ability to function effectively in a school setting. . . . At this time, we do not feel that you meet basic HTSB standards or standards for the profession set by our accreditors."

## D.  Oyama's Administrative Appeal

Oyama first responded to Dr. Moniz's denial letter in a July 18, 2011 letter to Dr. Moniz and the Academic Grievance Committee seeking "an amicable remedy." While disputing Dr. Moniz's conclusions based on his statements, Oyama noted that any statements he had made were "in an academic, intellectual setting." He argued that the University had violated his right of free speech and violated its own rules by failing to give him timely notice and not obtaining his signature on the field evaluation form. Nevertheless, Oyama proposed that the College of Education refund all tuition payments in exchange for his forfeiting all "credits and/or grades," and he would not become a classroom teacher. Dr. Moniz rejected this offer and advised Oyama of his "right to appeal in writing via the Office of the Dean of Students."

Oyama next timely appealed the denial of his student teaching application by filing an academic grievance complaint with the Dean of the College of Education, Christine Sorensen. Dean Sorensen reviewed the decision and convened a three-person committee, including officials from within and outside the College of Education, to investigate and review Oyama's academic grievance complaint. The committee interviewed Oyama and three professors of Oyama's choice.

On November 17, 2011, the grievance committee issued its report and findings to Dean Sorensen for her consideration. The report concluded that Oyama "should not be allowed to student teach since dispositions as well as comments and statements made during classes and our interview are serious matters of concern." It also found that the University committed "two violations" of its own procedures: it failed to timely notify Oyama of the standards for advancement in the academic program, and it failed to provide Oyama with his field experience evaluations.

In a letter dated December 15, 2011, Dean Sorensen informed Oyama of her final decision. Citing "the standards approved by the state for Hawaii's teachers and the NCATE standards under which the licensing programs operate," Dean Sorensen concluded that (i) the department had provided a proper basis for rejecting Oyama's application to student teach; (ii) the University provided Oyama notice of the applicable standards in the Program's handbook and other documents; and (iii) the University should have notified Oyama about its "dispositional concerns" in a timely manner to allow him to make an informed decision about his future in the program and avoid incurring additional expenses. Dean Sorensen accordingly proposed reimbursing Oyama for certain expenses and allowing him to withdraw from certain courses, on the condition that Oyama release all claims related to his participation in the program.[4] Dean Sorensen

---

[4] We note that the University's failure to give Oyama timely notice of its concerns does not affect the ultimate validity of its conclusions. Although Dean Sorensen's offer indicates that the violation of the University's regulations may have supported monetary relief based on Oyama's reliance, that issue is not relevant to this case, which concerns only Oyama's First Amendment and procedural Due Process rights.

emphasized the University's "responsibility to ensure that candidates in the state-approved teacher education program meet all standards and to recommend an individual to the licensing agency only when we feel a candidate meets these expectations."

## E. District Court Proceedings

Oyama rejected that offer. Instead, he filed a complaint against the University of Hawaii and university officials alleging violations of the First Amendment and the Due Process Clause of the Fourteenth Amendment.[5]

Granting the University's motion for summary judgment, the district court concluded that because the individual defendants[6] did not violate Oyama's First and Fourteenth Amendment rights, the individual defendants were entitled to qualified immunity.[7] To analyze Oyama's First Amendment claim, the district court relied upon student speech cases,

---

[5] Oyama's complaint named as defendants the University of Hawaii, Sorensen, and Moniz. For purposes of this appeal, we refer to all Defendants-Appellees as the "University." Oyama's complaint also alleged violations of state law and substantive due process. The district court rejected those claims, and Oyama does not appeal those rulings.

[6] The district court granted summary judgment to the University based on the Eleventh Amendment doctrine of sovereign immunity. Oyama did not appeal that determination.

[7] The district court also determined that because Sorensen and Moniz did not violate Oyama's constitutional rights, they were entitled to qualified immunity. The University has not asserted a qualified immunity defense on appeal. At oral argument, the University expressly urged the panel not to consider qualified immunity. Accordingly, we do not reach the issue of qualified immunity.

including the Supreme Court's decision in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), and Judge Graber's opinion in *Brown v. Li*, 308 F.3d 939 (9th Cir. 2002), which extended *Hazelwood* to the university setting.**[8]** Applying these cases, the district court concluded that University administrators had made an "academic decision based on professional judgment" that "was reasonably related to a legitimate pedagogical purpose – meeting the Hawaii and National teacher standards." Echoing Judge Graber's statement that "the First Amendment does not require an educator to change the assignment to suit the student's opinion or to approve the work of a student that, in his or her judgment, fails to meet a legitimate academic standard," *Brown*, 308 F.3d at 949, the district court reasoned that the "First Amendment does not require Defendants to accept Plaintiff in a student teaching program if in their judgment he did not meet State and National teaching standards." The district court also concluded that the "University afforded [Oyama] adequate procedural due process." Oyama timely appeals.

## II.

"We review the district court's grant of summary judgment *de novo*." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015). "[W]e may affirm based on any ground supported by the record." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008).

---

**[8]** The portion of Judge Graber's opinion in *Brown* applying *Hazelwood* in the university setting did not command a majority of the panel.

## III.

*A.  First Amendment Claim*

Oyama argues that the University's decision to deny his student teaching application violated his First Amendment right to freedom of speech.  Oyama equivocates, however, on the question of which First Amendment doctrine applies to his claim. Oyama first characterizes the University's decision as "retaliation for [his] personal opinions," a characterization evocative of the public employee speech doctrine first recognized in *Pickering v. Board of Education*, 391 U.S. 563 (1968).  *See id.* at 568 (addressing the "balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees").  Oyama then invokes student speech doctrine, quoting the Supreme Court's classic observation that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

We understand the hybrid nature of Oyama's First Amendment claim.  On the one hand, Oyama was a student in an academic setting.  On the other hand, Oyama was a candidate for a certification that would allow him to work as a public school teacher.  Oyama's claim defies easy categorization because his position at the University combined the characteristics of both a student and a public employee.

In light of the mixed characteristics of Oyama's claim, we address the applicability of both student speech and public

employee speech doctrines. While both doctrines illuminate certain principles that guide our analysis, we conclude that neither, standing alone, provides an adequate framework for evaluating Oyama's claim. Drawing from both student speech and public employee speech doctrines and from the few decisions of other courts that have confronted free speech claims in the certification context, we conclude that the University did not violate Oyama's First Amendment rights because its decision related directly to defined and established professional standards, was narrowly tailored to serve the University's core mission of evaluating Oyama's suitability for teaching, and reflected reasonable professional judgment.

### 1. Student Speech Doctrine

Because Oyama was a student when the University denied his student teaching application, we begin by examining the Supreme Court's student speech jurisprudence. As Oyama correctly notes, it is "clear that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Morse v. Frederick*, 551 U.S. 393, 396 (2007) (quoting *Tinker*, 393 U.S. at 506). At the same time, however, "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Hazelwood*, 484 U.S. at 266 (citation omitted) (quoting *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)).

In the seminal student speech case, *Tinker*, the Court held that a high school may not suppress its students' speech unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline

of the school." 393 U.S. at 513. *Tinker* involved a group of students who wore black armbands to school in protest of the Vietnam War. 393 U.S. at 504. The Court held that neither the high school's "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," nor its "urgent wish to avoid the controversy which might result from the expression" was sufficient to justify a ban on the students' "silent, passive expression of opinion, unaccompanied by any disorder or disturbance." *Id.* at 508–10.

Since *Tinker*, however, the Court has identified several circumstances in which a high school may restrict its students' speech. In *Fraser*, the Court held that a school district "acted entirely within its permissible authority" in suspending a high school student for "giving a lewd speech at a school assembly." 478 U.S. at 677, 685. In *Hazelwood*, the Court held that high school officials may delete potentially inappropriate material from a student newspaper "so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. Most recently, in *Morse*, the Court allowed the suspension of a student who held up a banner reading "BONG HiTS 4 JESUS" as the Olympic torch passed by, reasoning that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." 551 U.S. at 397. All of these cases involved the speech of high school students at school or school-sanctioned events. Beyond that context, "the Court has noted only that '[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents.'" *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1067 (9th Cir. 2013) (alteration in original) (quoting *Morse*, 551 U.S. at 401).

The district court evaluated Oyama's claim within the student speech framework and rejected it under *Hazelwood*, finding that the University's action was reasonably related to legitimate pedagogical concerns.  Student speech doctrine does identify certain principles that inform our analysis here. First, the Court's student speech precedents recognize, to some extent, an institutional rationale for a school's decision to regulate its students' speech.  In *Morse*, for example, the Court held that a high school could confiscate the "BONG HiTS 4 JESUS" banner and suspend the student who held it because of the school's congressional mandate to prevent illegal drug use among its students.  *See* 551 U.S. at 408.  In this case, the University similarly bears an institutional responsibility: under state policy and national accreditation standards, it must limit certification recommendations to individuals suitable to enter the teaching profession.  This institutional responsibility, like the "governmental interest in stopping student drug abuse" in *Morse*, may allow the University to deny a student teaching application based on speech demonstrating that the applicant lacks the professional skills and disposition to enter a classroom, even as a student teacher.  *Id.*

Second, student speech doctrine recognizes a school's interest in managing how it "lend[s] its name" or its "imprimatur" to student expression. *Hazelwood*, 484 U.S. at 271–72.  Here, this "imprimatur" concept resonates not because the views of a certification candidate may be "erroneously attributed to the school," *id.* at 271, but rather because the act of certification forces the university to speak. When the University recommends a student for certification, it communicates to the world that, in its view, that student is fit to practice the profession; as a result, the University places its "imprimatur" on each student it approves to teach.  The

consequences of that "imprimatur" are substantial. With the University's recommendation, a candidate is eligible to apply for a state teaching license and, so long as he or she satisfies other minimal requirements, to enter the classroom. Because the certification process necessarily implicates the University's "imprimatur," the University is entitled to deference in determining how to "lend its name" to certification candidates. *Id.* at 272.

While aspects of student speech doctrine are relevant here, the Supreme Court has yet to extend this doctrine to the public university setting. *See id.* at 273 n.7 (expressly reserving the question of "whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level"). In the twenty-seven years since *Hazelwood*, we too have declined to apply its deferential standard in the university setting. In *Brown*, which involved a university's decision not to approve a graduate student's thesis because it contained an unprofessional "Disacknowledgements" section, Judge Graber concluded that *Hazelwood* "appears to be the most analogous" Supreme Court case and "provides a workable standard for evaluating a university student's claim stemming from curricular speech." 308 F.3d at 951–52. But Judge Graber's approach failed to command a majority of the *Brown* panel. *See id.* at 955–56 (Ferguson, J., concurring) (agreeing that Brown's First Amendment claim fails, but not for the reasons expressed by Judge Graber); *id.* at 960 (Reinhardt, J., concurring in part and dissenting in part) ("vehemently disagree[ing] with Judge Graber's conclusion that *Hazelwood* provides the appropriate First Amendment standard for college and graduate student speech"). Nor has Judge Graber's reasoning been adopted by our precedents since. *See, e.g.*, *Flint v. Dennison*, 488 F.3d 816, 829 n.9 (9th

Cir. 2007) ("[W]e need not consider whether the principles of *Hazelwood* . . . apply with full force in a university setting—a question neither we nor the Supreme Court have definitively answered." (citations omitted)). "Our sister circuits are split on the question" of whether *Hazelwood* applies in the university setting. *Id.* at 829 n.9.[9]

This case presents no occasion to extend student speech doctrine to the university setting. Under that doctrine, the key rationales for restricting students' speech are to ensure that students "are not exposed to material that may be inappropriate for their level of maturity" and "learn whatever lessons the activity is designed to teach." *Hazelwood*, 484 U.S. at 271. Neither of these rationales is relevant here. Concerns about student maturity cannot justify restrictions on speech in this context because certification candidates are adults; indeed, a prerequisite for enrollment in the Program is graduation from a four-year institution of higher education. *See Widmar v. Vincent*, 454 U.S. 263, 274 n.14 (1981) (explaining that "[u]niversity students" are "young adults" and "are less impressionable than younger students."); *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 246 (3d Cir.

---

[9] *Compare, e.g.*, *Ward v. Polite*, 667 F.3d 727, 733–34 (6th Cir. 2012) ("Nothing in *Hazelwood* suggests a stop-go distinction between student speech at the high school and university levels, and we decline to create one."), *Keeton v. Anderson-Wiley*, 664 F.3d 865, 875 (11th Cir. 2011) (applying *Hazelwood* in university setting), *Hosty v. Carter*, 412 F.3d 731, 735 (7th Cir. 2005) (en banc) ("We hold . . . that *Hazelwood*'s framework applies to subsidized student newspapers at colleges as well as elementary and secondary schools."), and *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1285, 1289–93 (10th Cir. 2004) (concluding that a graduate student's speech "constitutes 'school-sponsored speech' and is thus governed by *Hazelwood*"), *with Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.*, 868 F.2d 473, 480 n.6 (1st Cir. 1989) ("*Hazelwood* . . . is not applicable to college newspapers.").

2010) ("Considerations of maturity are not nearly as important for university students, most of whom are already over the age of 18 and entrusted with a panoply of rights and responsibilities as legal adults.").   Nor do "pedagogical concerns" explain why the University denied Oyama's application on the basis of his speech. *Hazelwood*, 484 U.S. at 273.  The University's purpose was not to teach Oyama any lesson; rather, it was to fulfill the University's *own* mandate of limiting certification recommendations to students who meet the standards for the teaching profession. Hawaii entrusts the University with the task of verifying a candidate's ability to "function effectively" as an educator in public schools.  This institutional responsibility, and not the "pedagogical concerns" of student speech doctrine, is the reason that the University evaluated or "regulated" Oyama's speech.   Therefore, student speech doctrine does not adequately address the governmental purposes at stake in this context.

Furthermore, student speech doctrine fails to account for the vital importance of academic freedom at public colleges and universities.  As the Supreme Court has explained,

> The essentiality of freedom in the community of American universities is almost self-evident. . . .  To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . .  Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *see also Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). The importance of academic freedom at a public university does not disappear when one walks down the hall from a political philosophy seminar to a professional certification program like the University of Hawaii's. Indeed, the progress of our professions, including secondary education, may depend upon the "discord and dissent" of students training to enter them: it is by challenging the inherited wisdom of their respective fields that the next generation of professionals may develop solutions to the problems that vexed their predecessors. *Rodriguez*, 605 F.3d at 708. Thus, our analysis of Oyama's claim would be constitutionally deficient if it did not reflect the "special niche" universities occupy "in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). The Court's student speech cases provide no basis for doing so.[10]

### 2. Public Employee Speech Doctrine

Oyama alternatively suggests that the University's denial of his student teaching application was analogous to an employer's act of retaliation, which is governed by *Pickering* and its progeny. *Pickering* "requires a court evaluating restraints on a public employee's speech to balance 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services

---

[10] In determining that *Hazelwood* does not provide the appropriate framework for evaluating a First Amendment claim such as Oyama's, we need not and do not decide whether the *Hazelwood* standard can ever apply in the context of student speech at the college and university level.

it performs through its employees.'" *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam) (alteration in original) (quoting *Pickering*, 391 U.S. at 568). "In unraveling the case law since *Pickering*, we have further refined the Court's balancing test into a five-step inquiry." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013) (en banc). We ask:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).[11]  The

---

[11] In *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), we declined to extend the Supreme Court's reasoning in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which held that the First Amendment does not protect statements made by public employees "pursuant to their official duties," 547 U.S. at 421, to public employee speech "related to scholarship or teaching." *Demers*, 746 F.3d at 406 (quoting *Garcetti*, 547 U.S. at 425). *Demers* applied *Pickering* and *Connick*, *see id.* at 412–13, then remanded to the district court to consider, "as appropriate," whether "defendants had a sufficient interest in controlling or sanctioning [plaintiff's speech] to deprive it of its First Amendment protection," whether the plaintiff's speech was "a substantial or motivating factor in any adverse employment action," and "whether defendants would have taken such adverse employment action absent the protected speech," *id.* at 417.  Here, because we consider how public employee speech doctrine may, as a general

*Pickering* framework "give[s] [public] employers wide discretion and control over the management of their personnel and internal affairs," *Nichols v. Dancer*, 657 F.3d 929, 933 (9th Cir. 2011) (internal citation and quotation marks omitted), and mandates "substantial deference . . . to the government's reasonable view of its legitimate interests," *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 678 (1996).

More explicitly than student speech doctrine, public employee speech doctrine clarifies the University's rationale for regulating Oyama's speech: like a government employer, the University must "protect its own legitimate interests in performing its mission" of limiting teacher certification to qualified professionals. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011) (quoting *Roe*, 543 U.S. at 82). "The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick v. Myers*, 461 U.S. 138, 150 (1983). The Court has explained that because "[g]overnment agencies are charged by law with doing particular tasks," the government's "interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters v. Churchill*, 511 U.S. 661, 674–75 (1994). In its certification role, the University, like a government employer, is "charged by law" with a "particular task"—here, that of ensuring that licensed teachers have "the appropriate training, preparation, and competencies for teaching." *Id.* As the public employee speech cases recognize, the University may constitutionally evaluate or restrict the candidate's speech to

matter, facilitate our evaluation of Oyama's claim, we need not address the interaction between *Demers* and *Eng*'s "five-step inquiry."

fulfill its responsibilities to the public and to achieve its institutional objectives.

Further, cases addressing the claims of public teachers provide a wealth of wisdom about the standards to which teachers and school officials are held. For example, in *Melzer v. Board of Education*, 336 F.3d 185 (2d Cir. 2003), a teacher was an active member of NAMBLA, whose stated goal was to change the laws and attitudes governing sexual activity between men and boys. When his membership became public, many parents and students were outraged. *Id.* at 189–92, 199. The Second Circuit affirmed the school's termination of the teacher, concluding that the disruption likely to result from his continued employment would "interrupt[] the children's education, impair[] the school's reputation, and impair[] educationally desirable interdependency and cooperation among parents, teachers, and administrators." *Id.* at 199. Similarly, in *Craig v. Rich Township High School District 227*, 736 F.3d 1110 (7th Cir. 2013), a high school guidance counselor wrote a book entitled "It's Her Fault," which, among other things, urged women to engage in "a certain level of promiscuity before marriage" and delved "into a comparative analysis of the female genitalia of various races." *Id.* at 1114. The Seventh Circuit upheld the school's termination of the counselor, concluding that the counseling position required the employee to "maintain a safe space for his students in order to ensure they remain[ed] willing to come to him for advice," and that without that environment, the students would "not approach him" and he could not "do his job." *Id.* at 1119–20. The similarities between the circumstances at issue in these cases and those presented here make public employee speech doctrine an attractive means of analysis for Oyama's First Amendment claim.

However useful public employee speech doctrine may appear, however, it cannot control our analysis of Oyama's First Amendment claim. The first and most basic problem is that Oyama was not a government employee. In fact, Oyama was two steps removed from government employment: he was an applicant to a university *program* that could, in turn, permit him to teach at a secondary school under the supervision of a mentor teacher. Even then, only if Oyama satisfactorily performed as a student teacher, and met other requirements, would the University recommend him for certification and actual employment by the state. Characterizing Oyama as a public employee for First Amendment purposes would thus require us to extend this doctrine to those who do not yet work for the government but may wish to do so—a move we have not yet made. *See Johnson*, 658 F.3d at 962 (explaining that when a First Amendment plaintiff is not a government employee, "*Pickering*'s absence [is] not only unsurprising, but necessary").[12] Given Oyama's status as a student and the attenuated nature of his relationship to government employment, this appeal makes a poor candidate for taking such a fateful step.

The second problem, as with student speech doctrine, is that public employee speech doctrine provides no basis for

---

[12] Other circuits have applied public employee speech doctrine in the job applicant setting. *See, e.g.*, *Worrell v. Henry*, 219 F.3d 1197, 1207 (10th Cir. 2000) (applying *Pickering* to the withdrawal of an offer of employment after the employer discovered the employee's past speech activity); *Bonds v. Milwaukee Cty.*, 207 F.3d 969, 979 (7th Cir. 2000) (applying *Pickering* analysis to a First Amendment retaliation claim of someone seeking public employment); *Hubbard v. EPA*, 949 F.2d 453, 460 (D.C. Cir. 1992) (applying *Pickering* to a hiring decision). What we have here, however, is not precisely a job applicant situation either.

considering the role of academic freedom at public universities. Public employee speech doctrine permits the government to regulate speech that might limit the "efficiency" of its operations, *Pickering*, 391 U.S. at 568; it does not require the government to promote, or even consider, its employees' freedom "to inquire, to study and to evaluate, to gain new maturity and understanding," *Sweezy*, 354 U.S. at 250. As a student at the University of Hawaii, Oyama enjoyed greater freedom to test his ideas, critique professional conventions, and develop into a more mature professional than he would as a government employee. To hold Oyama to the same standard as we hold public employees would deprive him of rights the First Amendment guarantees him as a public university student.[13]

3.   The Certification Cases

A third framework for analysis more aptly suits Oyama's claim: a set of decisions of other courts that have considered free speech claims in the "certification" context. *See generally* Emily Gold Waldman, *University Imprimaturs on Student Speech: The Certification Cases*, 11 First Amend. L. Rev. 382 (2013). The doctrinal bases for these decisions differ: some invoke student speech doctrine, some rest on public employee speech doctrine, and at least one presents a new test altogether. Though these cases are analyzed under different First Amendment doctrines, their substance echoes

---

[13] In part due to considerations of academic freedom, we have declined to extend *Garcetti* to the context of public school teachers. *See supra* note 11. Even absent *Garcetti*'s additional level of deference to public employers, however, public employee speech doctrine's "substantial deference" to the "government's reasonable view of its legitimate interests" fails to provide the protection to which a student at a public university is entitled. *Umbehr*, 518 U.S. at 678.

a common theme—the upshot is some deference to the certifying institution, but with significant limitations.

Courts generally defer to certification decisions based on defined professional standards. In *Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011), for example, the Eleventh Circuit applied *Hazelwood* to uphold a university's decision to sanction a student in a graduate-level school counseling program for stating that she "intended to attempt to convert students from being homosexual to heterosexual." *Id.* at 868. The university concluded that these statements implied a course of conduct that would "violate several provisions of the American Counseling Association's (ACA) Code of Ethics," which the university "must adopt and follow . . . in order to offer an accredited program." *Id.* at 869, 876. Similarly, in *Hennessy v. City of Melrose*, 194 F.3d 237 (1st Cir. 1999), the First Circuit applied *Pickering* to uphold the termination of a student teacher for repeatedly interrupting school events with religious "proselytizing," such as showing a picture of an aborted fetus to another teacher and storming out of a presentation on art that he considered "obscene." *Id.* at 242–43. The First Circuit noted that the candidate's religious outbursts were incompatible with general professional standards for preserving collegiality and respect in the school and, more specifically, with four "common teaching competencies" required for state certification. *Id.* at 243, 247.

By contrast, courts are more reluctant to defer to certification decisions based on officials' personal disagreement with a student's views. In *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012), for example, the Sixth Circuit, applying *Hazelwood*, ruled in favor of a student expelled from a counseling degree program for asking her supervisor

to refer a gay client to another student counselor. Unlike in *Keeton* or *Hennessy*, the university's decision appeared to rest on officials' personal views, not on professional standards, which instead supported the "values-based referral[]" the student requested. *Id.* at 735. In *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004), the Tenth Circuit adopted a similar methodology to evaluate the First Amendment claim of a Mormon student who withdrew from the University of Utah's actor training program after faculty members faulted her for refusing to use obscene language in theatrical performances. The university cited professional acting standards to justify its decision, but record evidence showed that faculty members had expressed their personal disapproval of the student's interest in being a "good Mormon girl[]." *Id.* at 1292–93. The Tenth Circuit held that the university was not entitled to summary judgment because there was a genuine issue of material fact "as to whether [the university's] justification . . . was truly pedagogical or whether it was a pretext for religious discrimination." *Id.* at 1293.[14] Thus, while these decisions lack a common doctrinal foundation, they appear to provide a rule we find instructive here: universities may consider students' speech in making certification decisions, so long as their decisions are based on defined professional standards, and not on officials' personal disagreement with students' views.

---

[14] *See also Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1292–94 (11th Cir. 2007) (applying public employee speech doctrine to the claim of a student enrolled in a graduate-level social work program and terminated from a student practicum at a psychiatric institute for failing to demonstrate the "professional conduct" required of social workers); *Tatro v. Univ. of Minn.*, 816 N.W.2d 509, 520–21 (Minn. 2012) (articulating a new test to uphold a university's decision to sanction a mortuary sciences student for violating a student code of professional conduct and professional standards for funeral service education).

### 4. Application

Drawing from the Supreme Court's student speech and public employee speech precedents and from the decisions of other courts in the certification context, we hold that the University of Hawaii's decision to deny Oyama's student teaching application did not offend the First Amendment because it related directly to defined and established professional standards, was narrowly tailored to serve the University's foundational mission of evaluating Oyama's suitability for teaching, and reflected reasonable professional judgment.

### (i) Directly Related to Defined and Established Professional Standards

The University's decision was directly related to defined and established professional standards.  Two sets of professional standards provided the foundation for the University's decision: one governing sexual relationships with children and another governing the education of disabled students.  Oyama stated that "it would be fine" for "a 12-year-old girl" to have a "consensual" relationship with her teacher, that "the age of consent should be either 0, or whatever age a child is when puberty begins," and that "real life child predation should be legal."  As the University explained to Oyama, however, Hawaii Department of Education Rules prohibit sexual contact between teachers and students or minors. *See* Haw. Admin. Rules, § 8-54-9.  Furthermore, the HTSB requires all teachers to "take all reasonable precautions" to protect student safety.  *See* HTSB Code of Ethics, Principle I.   To protect a student's "safety," a secondary school teacher must protect underage students from sexual contact with adults, which may qualify as

first-degree sexual assault under Hawaii law. *See* Haw. Rev. Stat. § 707-730.

These standards are established not only in Hawaii but also at a national level. According to one study, the sexual-assault laws of over half the states address sexual relationships between educators and students. *See* Caroline Hendrie, *States Target Sexual Abuse by Educators*, Educ. Wk., Apr. 30, 2003. Many states also require school teachers to report suspected sexual abuse of their students. *See* Jason P. Nance & Philip T.K. Daniel, *Protecting Students from Abuse: Public School District Liability for Student Sexual Abuse Under State Child Abuse Reporting Laws*, 36 J.L. & Educ. 33, 35 (2007). The Department of Education has specifically identified "state educator certification regulations" as a means to combat the problem of sexual abuse of children. *See* U.S. Dep't of Educ., *Educator Sexual Misconduct: A Synthesis of Existing Literature* 50 (2004).

The University's decision was also directly related to defined and established professional standards for teaching students with disabilities. Oyama characterized special education students as "fakers," asserted that it is not reasonable to expect secondary school teachers to teach "the students with learning disabilities," and voiced his opposition to the goal of "inclusion for the disabled student." As the university explained, however, its national accreditation body mandates that student teachers demonstrate "professional dispositions necessary to help all students learn," including students with disabilities. *See also Professional Development Schools*, *supra*, at 25 (explaining that accredited programs must "reflect issues of equity and access to knowledge by diverse learners"). Moreover, the HTSB requires all student teachers to "[p]rovide services to students in a

nondiscriminatory manner" and "[a]dapt[] instruction to students' differences in development, learning styles, strengths and needs." Finally, the public schools of every state must comply with the Individuals with Disabilities Education Act (IDEA), which entitles all disabled children to a free public education tailored to their needs. *See K.D. ex rel. C.L. v. Dep't of Educ.*, 665 F.3d 1110, 1114 (9th Cir. 2011) (citing Pub. L. 101-476, 84 Stat. 175 (1990), *codified at* 20 U.S.C. § 1400 *et seq.*). The IDEA ensures that "disabled children will be integrated into society and enhance their personal well-being and their important societal contributions." *JG v. Douglas Cty. Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008). The University correctly identified the clear tension between these standards and Oyama's statements.

The First Amendment does not prevent the University from denying Oyama's student teaching application after determining that his statements reflected a failure to absorb these defined and established professional standards. Both student speech and public employee speech doctrine recognize that the scope of the government's authority to regulate speech within its institutions depends upon the objectives those institutions are designed to achieve. *See, e.g.*, *Fraser*, 478 U.S. at 685 (explaining that a high school may regulate speech that "would undermine the school's basic educational mission"); *Roe*, 543 U.S. at 82 (explaining that a public employer may regulate speech to "protect its own legitimate interests in performing its mission"); *Connick*, 461 U.S. at 150–51 ("The *Pickering* balance requires full consideration of the government's interest in the effective and

efficient fulfillment of its responsibilities to the public.").[15] Here, the people of Hawaii enacted a law providing that "[n]o person shall serve as a half-time or full-time teacher in a public school without first having obtained a license." Haw. Rev. Stat. § 302A-805. Hawaii thus established a certification program at the University of Hawaii to "ensure that education professionals possess the appropriate training, preparation, and competencies for teaching," to limit teacher licenses to "knowledgeable, effective, and caring professionals," and to confirm that student teachers "[a]ct, speak, and dress" like teachers. To fulfill its responsibilities to the public, the University may evaluate a candidate's suitability for teaching based, in part, on his or her speech. Specifically, the University's evaluation of whether Oyama's statements are consistent with defined and established professional standards is entirely compatible with the University's institutional purpose of evaluating a candidate's suitability for the teaching profession.

By focusing on the relationship between the University's decision and the standards of the profession in which Oyama sought certification, we join the other courts that have considered free speech claims in the certification context, even as we part from most of them in declining to squeeze this case into an existing doctrinal framework that does not quite fit. *See, e.g.*, *Keeton*, 664 F.3d at 869 (upholding a university's decision to sanction a graduate student in a school counseling program where the student's statements

---

[15] *See generally* Robert C. Post, *Constitutional Domains: Democracy, Community, Management* 237 (1995) (explaining that, under both student speech and public employee speech doctrine, "[t]he constitutional question . . . is whether the authority to regulate speech is necessary for the achievement of legitimate institutional objectives").

suggested that she would "violate several provisions of the American Counseling Association's (ACA) Code of Ethics, which [the university] was required to adopt and teach" to offer an accredited counseling program); *Ward*, 667 F.3d at 735 (ruling in favor of a student expelled from a counseling degree program where professional standards of ethics did not, as the university argued, prohibit the course of conduct the student proposed to her supervisors); *Tatro*, 816 N.W.2d at 522 (upholding a university's decision to sanction a mortuary sciences program student whose Facebook posts conflicted with "an established professional conduct standard for mortuary science professionals").   These courts have emphasized, as we do, that certification programs are designed to ensure that their students meet the professional standards of their chosen fields.  *See, e.g.*, *Keeton*, 664 F.3d at 876 ("[T]he entire mission of [the university's] counseling program is to produce ethical and effective counselors in accordance with the professional requirements of the ACA."); *Tatro*, 816 N.W.2d at 511–12 ("[T]he primary purpose of the program—its 'mission'—is to prepare students to be licensed funeral directors and morticians.").  Here, the University's certification program is "designed for students who possess a baccalaureate degree and wish to obtain eligibility for a license to teach."  Thus, while we take a different view of the applicability of First Amendment doctrine to the certification context, the certification cases further support our conclusion that the University could deny Oyama's student teaching application where his statements indicated that he had not absorbed, and likely would not comply with, defined and established standards for the teaching profession.

We emphasize that the University did not "establish" or "define" these professional standards by fiat.  Its decision was not, in other words, based on school policies untethered to

any external standards, regulations, or statutes governing the profession. Instead, the University relied upon standards established by state and federal law, the Hawaii Department of Education, the HTSB, and the University's national accreditation agency, the NCATE. From Dr. Ratliffe's initial conversation with Oyama to Dean Sorensen's letter affirming the denial of Oyama's application, the University framed its concerns about Oyama's statements by reference to professional standards set beyond the walls of its own institution. The University thus compared Oyama's speech not to its own idiosyncratic view of what makes a good teacher, but rather to external guideposts that establish the skills and disposition a secondary school teacher must possess.

That Oyama did not in fact consummate the acts proscribed by these professional standards does not mean that the University's decision to deny his application was not directly related to them. State policy required the University to "[v]erify" Oyama's "ability to function effectively in Department classrooms" *before* approving his student teaching application. Therefore, the University's decision was, by necessity, prospective in nature. Oyama stood in the doorway of the teaching profession; he was not at liberty to step inside and break the house rules. But that does not mean that the University was obligated to invite him in. Rather, the University could look to what Oyama *said* as an indication of what he would *do* once certified. *Cf. Connick*, 461 U.S. at 152 (explaining that a public employer need not wait "to allow events to unfold to the extent that the disruption to the office is manifest before taking action"). Oyama's statements concerning "child predation" and "inclusion" of disabled students suggest that he had not internalized basic concepts embodied in the relevant external standards—the nature of

sexual predation on children, for example, or the importance of including and supporting disabled students. The University need not—and, consistent with its mandate under state policy, could not—have approved Oyama's application and sat idly by while his failure to accept basic professional standards led to results these standards were designed to prevent.

For example, with regard to the sexual abuse of children, Oyama's belief that young children can meaningfully "consent" to sexual activity with adults, and failure to appreciate the lifelong impact on victims of child sexual abuse, could well impede him from recognizing signs of such abuse in his students or evidence of such abuse by school personnel. His promise to report illegal abuse is therefore beside the point; he can only report what he perceives, and his attitudes could well stand in the way of his perception. Similarly, with regard to teaching disabled children, the University was entitled to regard Oyama's insistence that most disabilities are feigned and that requiring high school teachers to educate disabled students is unreasonable as indicators that he would not make the effort to identify students with disabilities or adjust his lessons for individual students whose disabilities require special accommodations. Given these legitimate concerns, the University could "tak[e] action" and deny Oyama's application before permitting him to enter the classroom as a student teacher. *Id.*

### (ii) Narrowly Tailored

We next ask whether the University's decision was narrowly tailored to serve the University's purpose of evaluating Oyama's suitability for the teaching profession. In a variety of contexts, the First Amendment requires that

restrictions on protected speech be narrowly drawn. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (in the context of the government's "time, place, or manner" restrictions, the restriction "must be narrowly tailored" to serve the government's legitimate interests); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 565 (1980) (in the commercial speech context, "[t]he regulatory technique may extend only so far as the interest it serves"); *Butler v. Michigan*, 352 U.S. 380, 383 (1957) (explaining that an overbroad restriction on speech amounts to "burn[ing] the house to roast the pig"). "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) (quoting *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). We find such a requirement appropriate in this university setting, which provides the backdrop not only for some speech that the government may legitimately regulate, but also for much of the "discord and dissent" the First Amendment seeks to promote. *Rodriguez*, 605 F.3d at 708. Adopting a narrow tailoring requirement in this context, we ensure that the University does not transform its limited discretion to evaluate a certification candidate's professional fitness into a open-ended license to inhibit the free flow of ideas at public universities.

The University's decision was narrowly tailored to serve its goal of "employ[ing] and prepar[ing] educators who are knowledgeable, effective, and caring professionals." *Handbook*, *supra*, at 8. The University's decision primarily rested on Oyama's statements endorsing sexual relationships between children and adults, online and in "real life," and his statements expressing apathy towards disabled students and

an unwillingness to accommodate their classroom needs. These statements related directly to his suitability for teaching. By contrast, the record does not suggest that the University based its decision on speech unrelated to teaching. The University did not, for example, rely on upon several of Oyama's statements that may seem bizarre but have no relationship to the teaching profession—such as his statements that he "came from outer space" or "thinks about suicide every day." Nor did the University, based on the record before us, rely on statements addressing "social, political, esthetic, moral, and other ideas and experiences" that are unrelated to teaching but essential to the marketplace of ideas. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2674 (2011) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969)). Thus, rather than relying on any statement, no matter the subject, as a basis for its certification decision, the University limited its focus to Oyama's statements that directly addressed the roles and responsibilities of aspiring secondary school teachers.

Furthermore, the University based its decision only upon statements Oyama made in the context of the certification program—in the classroom, in written assignments, and directly to the instructors responsible for evaluating his suitability for teaching. For example, Oyama asserted that "real life child predation should be legal" in a written assignment in Dr. Ratliffe's class on "Educational Psychology: Adolescence and Education." When Dr. Ratliffe spoke to Oyama after class, Oyama explained that a "consensual relationship" between a 12-year-old girl and another teacher would be "fine." Similarly, Oyama stated that it is not reasonable to expect a secondary school teacher to teach "the students with learning disabilities" in a written communication to Mr. Siegel, Oyama's instructor in

"Educating Exceptional Students in Regular Classrooms – Secondary." There is no evidence that the University relied upon any statements Oyama may have made outside this context or communicated to a broader audience. Nor is there any evidence that the University attempted to restrict or take any adverse action in response to Oyama's expressive activities in other campus-related contexts, such as meetings with other students or protests to university officials. Beyond the limited context in which Oyama made the statements that supported the University's decision, Oyama was free to express his opinions on any subject he wished. Accordingly, the University's decision did not impose any restriction broader than necessary to achieve its goal of evaluating Oyama's suitability for teaching.

### (iii)     Reasonable Professional Judgment

We conclude that the First Amendment also requires us to ask whether the University's decision reflects reasonable professional judgment about Oyama's suitability for the teaching profession. A reasonableness inquiry is, of course, a common feature of First Amendment doctrine. *See Hazelwood*, 484 U.S. at 274–76 (student speech); *Connick*, 461 U.S. at 154 (public employee speech); *see also Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683 (1992) (forum-based analysis). Here, this inquiry is critical because not all inconsistencies between a candidate's statements and defined and established professional standards provide a reasonable basis to conclude that the candidate is not suitable to enter the profession. For example, the statement, "I hate cleaning my office" may be in tension with a professional standard to "keep the office tidy" but may not be a reasonable basis to conclude that the speaker is not fit to

enter the profession.[16]   Absent this inquiry, the University could use professional standards as a pretext for decisions based on officials' personal disagreement with the candidate's views.   As the Tenth Circuit explained in *Axson-Flynn*, "we would be abdicating our judicial duty if we failed to investigate whether the [professional standard] was pretextual."  356 F.3d at 1292–93 (emphasis omitted).  In this context, we may defer to the University's decision because of its prerogative to evaluate professional competencies and dispositions, not because of a blind faith in the University's sense of what views are right or wrong.  Consistent with this rationale for deference, we may uphold the University's decision only if it reflects reasonable professional judgment about Oyama's suitability for teaching.

The University's decision to deny Oyama's application satisfies this requirement.  First, the University had every reason to conclude that Oyama's statements concerning sexual relationships between teachers and students were "serious matters of concern."   The Supreme Court has recognized that sexual abuse "unfortunately is an all too common aspect of the educational experience." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1988); *see also, e.g.*, Richard Winton, *Ex-Marlborough School Teacher Admits Sexually Abusing Students*, L.A. Times, Oct. 21, 2015; Martha Irvine & Robert Tanner, *Sexual Misconduct Plagues U.S. Schools*, Wash. Post, Oct. 21, 2007.  According to a Department of Education study, "more than 4.5 million students are subject to sexual misconduct by an employee of

---

[16] *See generally* Deborah L. Rhode, *Moral Character as a Professional Credential*, 94 Yale L.J. 491 (1985) (discussing the variety and breadth of professional certification requirements, including the requirement of "good moral character").

a school sometime between kindergarten and 12th grade." *Educator Sexual Misconduct*, *supra*, at 18. The federal government has attributed this problem, in part, to school officials' recommendations of teacher candidates despite warning signs of the candidate's potential to abuse students. *See* U.S. Gov't Accountability Off., GAO-11-200, *K-12 Education: Selected Cases of Public and Private Schools that Hired or Retained Individuals With Histories of Sexual Misconduct* 3–5 (2010). In one example highlighted by the Government Accountability Office, school officials recommended a teacher for service despite complaints that he had accessed pornography on school computers; the teacher was subsequently convicted of sexually assaulting two students. *Id.* at 15–18. A perfectly reasonable way to prevent similar tragedies at Hawaii schools is to decline certification to candidates who vocally support sex between teachers and their twelve-year-old students. We put aside the risk that Oyama would himself abuse a student; his statements do not sufficiently support such a prediction, and we see no evidence that the University denied his application on the basis of this risk. Rather, the University could reasonably conclude that Oyama would fail to perceive, or to exercise the vigilance needed to identify and report, potential or actual sexual abuse of students by other adults. The University recognized these risks and appropriately made a decision, as Dean Sorensen put it, "not to place young children in harm[']s way."

The University's concern with Oyama's statements regarding disabled students was likewise well-founded. Congress enacted the Individuals with Disabilities Education Act in response to the "apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special education classes." *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1115 (9th Cir. 2010)

(citation and internal quotation marks omitted). Federal and state law mandate a commitment to providing disabled students the services they need and promoting a more integrated learning environment for all students. The University could reasonably conclude that a candidate who expresses his view that special education students are "fakers" to his professors would lack the professional disposition necessary to identify disabled students and teach all students, including those with disabilities. The University could also reasonably conclude that a candidate who considers it unreasonable to teach both disabled and non-disabled students would not put in the effort to "provide services to students in a nondiscriminatory manner" as a teacher.

Furthermore, the record demonstrates that Oyama's professors expressed concern not out of personal disagreement with Oyama's views but rather because of their "responsibility as a profession." Dr. Ratliffe, for example, told Dr. Moniz that she did not "mind that [Oyama] has opinions that are different from other people's" and "actually [found] [Oyama's] enthusiasm about his opinions refreshing," but nevertheless was "concerned that [Oyama] may not be aware of and in agreement with the safety issues about the adolescents who will be in his care." Mr. Siegel clarified to Oyama that his concerns were "not based on [Siegel's] opinion" but rather "on [his] 43 years as an educator," and his understanding of the criteria schools consider in hiring teachers. Even instructors who had initially defended Oyama as "likable" ultimately concluded that Oyama "was unsuitable for teaching." The record thus demonstrates that the University's certification decision reflects professional judgment, not personal disagreement with Oyama's views.

*B.  Procedural Due Process Claim*

Oyama also argues that the University's denial of his teaching application without a hearing violated his Due Process rights under the Fourteenth Amendment.  The district court properly rejected this argument.

The premise of Oyama's Due Process claim is that the University's denial of his student teaching application constituted "constructiv[e] dismiss[al]" from the Program and thus deprived him of a constitutionally protected interest in remaining in the Program.  This premise is questionable: the Program's handbook advises prospective students that admission to the Program does not guarantee admission to student teaching.  Participation in the Program without permission to student teach is consistent with the Program's basic structure; indeed, Dean Sorensen estimated that "around 20 students annually" are not approved for student teaching.  The denial of student teaching is thus more akin to the denial of access to honors-level courses on the basis of a student's poor grades than to expulsion.  *See Hennessy*, 194 F.3d at 250 (explaining that a certification candidate's due process claim was "especially tenuous" because the university "did not expel the appellant, but merely precluded him from continuing in a particular program").

But even if we accept Oyama's argument that the University's decision deprived him of a constitutionally protected interest, the University provided him with adequate process.  "When considering cases that originate in an educational institution, the law distinguishes between academic dismissals and disciplinary dismissals." *Hlavacek v. Boyle*, 665 F.3d 823, 826 (7th Cir. 2011).  Academic dismissals do not require a hearing and "meet[] the

requirements of procedural due process so long as the dismissal decision is 'careful and deliberate.'" *Brown*, 308 F.3d at 954–55 (quoting *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85 (1978)). Disciplinary dismissals, by contrast, may require more formal procedures. *See Horowitz*, 435 U.S. at 85–86 (citing *Goss v. Lopez*, 419 U.S. 565, 581, 584 (1975)).

The University's decision to deny Oyama's student teaching application was an academic decision. Throughout its communications with Oyama concerning his application, the University emphasized that its decision was based on the student teaching requirements described in the Program's handbook and established by professional standards. That the University's decision was based on Oyama's professional disposition, and not his intellectual aptitude, does not strip it of its academic character. In the context of this certification program, a central criterion for academic success was a demonstration of the ability to satisfy professional standards for teacher certification. *See Brown*, 308 F.3d at 954 (explaining that a university's decision not to publish a master's thesis because it contained an unprofessional "Disacknowledgements" section was "properly characterized as an 'academic' decision").[17]

*Horowitz* supplies "the standard for procedural due process in the context of academic decisions." *Id.* In *Horowitz*, a medical student argued that her school violated her procedural due process right by dismissing her from the program without a hearing. *See* 435 U.S. at 80–82, 85–86.

---

[17] Although there was no majority opinion in *Brown*, Judge Reinhardt concurred in Judge Graber's procedural due process analysis. *See Brown*, 308 F.3d at 956 (Reinhardt, J., concurring in part and dissenting in part).

The Court explained that the student's dismissal "rested on the academic judgment of school officials" that the student lacked "the necessary clinical ability to perform adequately" as a physician. *Id.* at 89–90. The Court held that the student was not entitled to a hearing and that the university satisfied the requirements of due process because the school "fully informed [the student] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment" and because "the ultimate decision to dismiss [the student] was careful and deliberate." *Id.* at 85.

Here, the University's denial of Oyama's student teaching application satisfied the due process requirements set forth in *Horowitz*. As in *Horowitz*, the University "fully informed [Oyama] of the faculty's dissatisfaction" with his performance: multiple professors told Oyama about their concerns regarding his suitability for the teaching profession. The University's decision was also "careful and deliberate." The University initially explained the reasons for its decision in Dr. Moniz's detailed letter to Oyama. The University then provided Oyama a robust process for appealing its initial decision: Dean Sorensen formed a multidisciplinary committee, which interviewed Oyama and three professors of his choice and prepared a detailed report reviewing the Dr. Moniz's decision. Dean Sorensen then provided Oyama another letter explaining the committee's findings and affirming the University's decision to deny his application. This process was sufficiently careful and deliberate to meet the requirements of the Due Process Clause.

**IV.**

In the context of a public university's professional certification program, the university may evaluate the student's speech, made in the course of the program, in determining the student's eligibility for certification without offending the First Amendment under certain circumstances. Because the University of Hawaii's decision to deny Oyama's student teaching application directly related to defined and established professional standards, was narrowly tailored to serve the University's core mission of evaluating Oyama's suitability for teaching, and reflected reasonable professional judgment, the University did not violate Oyama's First Amendment rights.  In addition, because the University granted Oyama adequate procedural protections in denying his student teaching application, it did not violate Oyama's due process rights.  Therefore, the district court properly granted summary judgment in favor of the University.

**AFFIRMED.**